502 A.2d 637

**Robert W. BANAS**

v.

**MATTHEWS INTERNATIONAL CORPORATION, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 13, 1984.

Filed Dec. 20, 1985.

466

Eric P. Reif, Pittsburgh, for appellant.

Robert C. Gallo, Pittsburgh, for appellee.

Before SPAETH, President Judge, and CAVANAUGH, WICKERSHAM, ROWLEY, OLSZEWSKI, MONTEMURO, BECK, TAMILIA and JOHNSON, JJ.

SPAETH, President Judge:

This is an action for defamation and breach of contract. The action arises out of appellee's dismissal as an employee of appellant. Appellant is engaged in the business of making, among other things, bronze grave markers. When appellee was dismissed, in July 1979, he was a tooler. In late June 1979, the Resurrection Cemetery, one of appellant's customers, notified appellant that contrary to the settled practice between the cemetery and appellant, a grave marker made at appellant's plant had been placed on

a grave in the cemetery without having first been purchased through the cemetery. Appellant engaged a private investigator to determine who had removed the marker from its plant. The investigator's report disclosed that appellee had, and that the marker had been placed on his nephew's grave. On July 31, 1979, following a meeting with several of appellant's officers during which appellee admitted having made and removed the marker, appellee was dismissed. Appellee's action for defamation is based on certain remarks concerning his dismissal made by two of appellant's officers. His action for breach of contract alleges breach of a section of appellant's employee handbook that provided that employees could do personal jobs with their supervisor's permission. A jury awarded appellee $15,000 for defamation, $25,000 punitive damages for defamation, and $10,000 for breach of contract. We affirm the award of $15,000 for defamation but otherwise reverse and enter judgment in favor of appellant. Appellee did not prove the sort of conduct on the part of appellant's officers that would entitle him to punitive damages for defamation. Neither did he prove the existence of an employment contract that could provide the basis of an action for breach of contract. The trial court should therefore have granted appellant's motion for judgment notwithstanding the jury's verdicts for punitive damages and damages for breach of contract.

## I

### The Defamation Claim

Appellant has argued two issues: whether the trial court erred in charging the jury that appellant's conditional privilege could be abused, and therefore lost, by a defamatory communication that was made negligently; and whether the trial court erred in charging the jury on punitive damages.

### -A-

Appellant argues that its conditional privilege could be abused, and therefore lost, only by a defamatory communi-

cation made with malice—not simply negligently, as the trial court charged the jury. This argument may be disposed of summarily.

■ In *Rutt v. Bethlehems' Globe Publishing Co.*, 335 Pa.Super. 163, 484 A.2d 72 (1984), we stated:

> *Matus [v. Triangle Publications, Inc.*, 445 Pa. 384, 286 A.2d 357 (1971) *cert. denied*, 408 U.S. 930, 92 S.Ct. 2494, 33 L.Ed.2d 343 (1972) ], ... declare[s] quite unequivocally, that under Pennsylvania law, once the issue of conditional privilege is raised by a defendant who has been sued by a private figure for defamatory communications concerning matters which are *not* of public concern, the burden of proof of the plaintiff in order to establish abuse of the conditional privilege is 'want of reasonable care and diligence to ascertain the truth' or more simply put, negligence. *Id.* 445 Pa. at 398, 286 A.2d at 365 (*quoting Purcell v. Westinghouse Broadcasting Co., supra*, 411 Pa. [167] at 179, 191 A.2d [662] at 668 [ (1963) ].

> 335 Pa.Super. at 185, 484 A.2d at 83.

We made this statement in the course of discussing the effects of the United States Supreme Court's decisions in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("so long as they do not impose liability without fault, the states may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual"), and *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (private figure plaintiff must prove 'actual malice') (plurality opinion), on Pennsylvania defamation law. The issue in *Rutt* was not the burden of proof to establish abuse of a conditional privilege but rather the burden to establish liability in a private figure defamation case, but our conclusion that *Gertz* and *Rosenbloom* had not altered the burden to establish liability compels the conclusion here that neither did those decisions alter the burden to establish abuse of a conditional privilege, and the latter burden is settled. The Pennsylvania Supreme Court has long held that "[w]ant of reasonable

care and diligence to ascertain the truth, before giving currency to an untrue communication, will destroy the privilege." *Montgomery v. Dennison,* 363 Pa. 255, 262, 69 A.2d 520, 524 (1949), *quoting Hartman v. Hyman & Lieberman,* 287 Pa. 78, 83–84, 134 A. 486, 487–488 (1926). *See also Baird v. Dun & Bradstreet, Inc.,* 446 Pa. 266, 275, 285 A.2d 166, 171 (1971) (negligence establishes abuse of conditional privilege). *And see Hepps v. Philadelph Newspapers, Inc.,* 506 Pa. 304, 314, 485 A.2d 374, 380 (1984), *appeal pending* —— U.S. ——, 105 S.Ct. 3496, 87 L.Ed.2d 628 (1985) ("privilege is abused if the defamatory statement is negligently published").[1]

**1.** We recognize that because the burdens to establish defamation and abuse of a conditional privilege are the same, the privilege loses any meaning. *See* Restatement 2d of Torts § 580B Comment 1 ("[a]ssuming that publishing a statement with lack of reasonable grounds to believe in its truth is the equivalent of negligence, proof of the fault required in general by the Constitution [under *Gertz* ] automatically would amount to an abuse of a conditional privilege and therefore render it invalid.")

Appellant cites two decisions by this court, *Doman v. Rosner,* 246 Pa.Super. 616, 371 A.2d 1002 (1977), and *Berg v. Consolidated Freightways, Inc.,* 280 Pa.Super. 495, 421 A.2d 831 (1980), in support of its suggestion that before *Hepps,* proof of fault greater than negligence was required to overcome a conditional privilege. Although *Doman* and *Berg* do indeed contain statements regarding 'malice,' an examination of those cases reveals that they do not hold that malice is required to destroy a conditional privilege. In *Doman,* we affirmed an order of summary judgment for the defendant principally on the ground that as a matter of law the statements were not defamatory. That being the case, our subsequent statement that there was no evidence that the defendant had "recklessly disregarded the truth," 246 Pa.Super. at 625, 371 A.2d at 1006, may be regarded as *dictum.* Even if not so regarded, however, the plaintiff would still have been required to establish malice because we concluded that he was a public figure. *See New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (public figure must prove malice). *Berg* was an appeal from an order denying defendants' motions for a new trial or for judgment n.o.v. We found "satisfactory" the trial court's instruction to the effect that the plaintiff was required to prove malice to overcome a conditional privilege. 280 Pa.Super. 495 at 501, 421 A.2d 831 at 834 (1980). Since the jury found malice, defendants-appellants did not complain on appeal that the jury should have been instructed that the plaintiff was required to meet the lesser standard of negligence. Our approval of the trial court's instruction should therefore not be understood as requiring a private figure defamation plaintiff to prove malice.

## -B-

■ Appellant argues that the trial court erred in charging the jury on punitive damages in two respects: the charge represented an incorrect, or at least confusing, statement of the law; and even if correct, the charge should not have been given because as a matter of law the evidence was insufficient to support an award of punitive damages. We do not consider the first argument, for we agree that the evidence was insufficient to support an award of punitive damages. Accordingly, on appellee's defamation claim, we vacate the award of $25,000 punitive damages. Appellant has not challenged the award of $15,000 compensatory damages, and it is affirmed.

The test to be applied in determining the sufficiency of evidence to support an award of punitive damages is stated in *Hepps v. Philadelphia Newspapers, Inc., supra.* There, the trial court withdrew the issue of punitive damages from the jury on the ground that the evidence was "insufficient to establish 'actual malice.'" *Id.,* 506 Pa. at 330, 485 A.2d at 388. On the plaintiff's appeal, the Supreme Court held that to be entitled to punitive damages, the plaintiff had to establish that the defamatory publication was made either with knowledge that it was false or with reckless disregard of whether it was false. *Id.,* 506 Pa. at 331, 485 A.2d at 389. Applying this test, the Court concluded that "there was no basis for the jury to have concluded that the publication was made with knowledge of the falsity of its content", and that "[w]hile the plaintiff attempted to show that the dissemination was made with reckless disregard of the truth of its content, it is equally apparent that a jury issue was not created under the clear and convincing test required for such an award of damages." *Id.,* 506 Pa. at 332, 485 A.2d at 389 (citations omitted). The Court therefore affirmed the trial court's decision to withdraw the issue of punitive damages from the jury.[2]

2. In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* — U.S. —, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (plurality opinion), the United States Supreme Court held that the *Gertz* rule that presumed and

Here, too, the trial court should have withdrawn the issue of punitive damages from the jury. Having failed to do that, the court should have granted appellant's motion for judgment n.o.v. as to the award of punitive damages.

Two statements served as the basis of appellee's defamation claim. The first statement was made at a meeting on July 31, 1979, preceding appellee's dismissal for having made a grave marker for his nephew's grave. The meeting was attended by Francis Donnelly, Vice President in charge of manufacturing, Charles Krepp, Vice President and Plant Manager, and Alfred Lee, Vice President and Director of Personnel. Appellee was shown a photograph of the grave marker and was asked whether and how he had made it. He admitted having made and removed the marker. N.T. 53. Then, according to appellee, Donnelly stated: "We can't have thieves around here, because we have a lot of valuable stuff in here." *Id.* The second statement was by Krepp. In response to the "uproar" that followed appellee's dismissal, Krepp met with employees in small groups to explain the reasons for the dismissal. At trial Krepp testified that "[p]eople were very concerned, because their security had been shaken." N.T. 159–60. He told the employees that appellee had been dismissed for the "unauthorized removal of company property." N.T. 161. He "may have" told "one or two employees" that appellee could have been "indicted because of this action." *Id.* He also stated that appellee "not only violated the company rules, but he also violated the rules of the municipality." *Id.* (quotation from Krepp's deposition as read into trial transcript).

Appellee's case hinged upon whether he had received permission to make the grave marker. He claimed that he

punitive damages are constitutionally acceptable only upon a showing of "actual malice," that is, knowing falsehood or reckless disregard as to truth, does not apply in a defamation suit brought by a private person. In such cases, the states are free to fashion their own rules as to damages. *Hepps* states the rule fashioned by the Pennsylvania Supreme Court. *And see generally* Note, Punitive Damages and Libel Law, 98 Harv.L.Rev. 847 (1985) (collecting authorities).

had received permission in compliance with the following provision in appellant's employee handbook:

Personal Jobs

Employees are not generally permitted to work on personal jobs during company time or on company premises. However, supervisors will often cooperate by giving permission for you to use our equipment and waste material for your personal work.

In support of this claim, appellee testified that he asked for and received permission to make the marker from Jack Campbell, his immediate supervisor. N.T. 42–43, 333. Appellee also testified that William Donatelli, the general foreman of the plant, gave him permission to take the piece of bronze scrap that he used in making the marker, N.T. 37, and that Betty Desport, a nonsupervisory receiver, gave him permission to take a scrap bronze vase used in making the marker, N.T. 76–77, 330. (Campbell, Donatelli and Desport denied having given the permission that appellee claimed they had. N.T. 333–34, 325, 330.) Appellee also testified that some seven to eight years previously he had made a marker for the grave of Donatelli's father as a personal job. N.T. 32. (Donatelli testified that he had not. N.T. 324.)

Appellant introduced a written policy statement, entitled "Bronze Division Procedures", that provided in part: "For the good of all concerned it should be thoroughly understood that we cannot run the risk of offending our customers by permitting employees to buy direct from Matthews. Every employee who desires to purchase a bronze memorial should contact the cemetery office and arrange for said purchase." N.T. 274–75. Appellee testified, however, that he did not become aware of this policy until after he had been dismissed. N.T. 81.

Also in regard to appellant's policy, appellant's witnesses testified that making a grave marker did not come within the handbook provision covering personal jobs. For example, Donatelli testified that under company policy, "you weren't allowed to make a memorial" for personal purposes.

N.T. 324. He also stated that he had become aware of the policy before he became a supervisor. Campbell testified that "[w]e never classified a [c]emetery memorial as a 'government job'" N.T. 325.[3] He stated that he had learned of the policy when he first became employed in 1946. N.T. 333–34. Donnelly testified that he considered personal jobs as "favor type projects that people request, such as house numbers, identification plates for the front of automobiles, perhaps initials for car doors ..." N.T. 344. Removing a marker from the plant, he said, is "an obvious violation of company policy." N.T. 345. Ralph West, Vice President and manager of memorial and architectural systems, testified that company policy was not to "give cemetery memorials to employees ... because it offends our customers." N.T. 275. He described typical personal jobs as projects like "house numbers, license plates, numbers, desk plates, things like that, ..." N.T. 276. Krepp testified that "the company was more than happy to allow people to use scrap or waste material for small personal jobs. It's in our handbook." N.T. 148. He further testified that "[a] license plate with initials 'RAB' on it is something that could very well be a bona fide order, but more likely it is a personal job. That is totally different than a memorial." N.T. 150.

When Krepp and West learned that a marker had been removed from the plant, they reported to Donnelly as their superior. West had received a telephone call from one of the plant managers "indicating that the cemetery had called and was quite concerned that we had changed our policy and were supplying memorials directly to our customers." N.T. 281. The matter was then turned over to James Parker, Vice President and General Counsel. N.T. 282. Parker ordered a private firm, Universal Security Consultants, Inc., to conduct an investigation to determine who had removed the marker. N.T. 192. Meanwhile, Krepp held a meeting of the plant foremen, including Campbell and Do-

3. In the jargon of appellant's workplace, "personal jobs" were usually referred to as "government jobs."

natelli. Krepp testified that he "asked them the specific question, were memorials ever approved for personal jobs, and the answer was a resounding no." N.T. 150. (Campbell testified that he did not recall Krepp or anyone else asking him "if Bob Banas had permission to do a 'government job.'" N.T. 135. Donatelli was not asked about the foremen meeting.) The private investigator's report concluded that appellee had removed the marker from the plant.[4] When Krepp told Donnelly the results of the report, Donnelly called the July 31 meeting at which, after reviewing the report, with appellee present, he said, "We can't have thieves around here...." The testimony on the issue whether during that meeting appellee was asked whether he had received permission to make the marker is at variance. Appellee testified that he told those attending the meeting that Campbell had given him permission. N.T. 86. Krepp testified that appellee said he had received permission from Donatelli. N.T. 304. According to Lee, appellee was asked whether he had received permission but he "did not ... name anyone at that time." N.T. 309. Donnelly testified that appellee said that he had not received permission. N.T. 347.

Of course, in considering the sufficiency of this evidence, we must view it in the light most favorable to appellee:

> In reviewing an order denying judgment n.o.v., we must view the evidence, together with all reasonable inferences therefrom, in the light most favorable to appellee as the verdict winner. *See, e.g., Lynch v. Metropolitan Life Insurance Co.*, 427 Pa. 418, 423, 235 A.2d 406, 409 (1967). *See also, Atkins v. Urban Redevelopment Authority of Pittsburgh*, 489 Pa. 344, 414 A.2d 100 (1980). Judgment n.o.v. should be entered when the facts are such that no two reasonable persons could disagree that the verdict was improper. *See, e.g., Cummings v.*

---

4. The report is dated July 18, 1979, and states that Universal Security Consultants, Inc., received the request to conduct its investigation from Parker on June 28, 1979.

*Borough of Nazareth,* 427 Pa. 14, 25–26, 233 A.2d 874, 880–81 (1967); *Bottorf v. Waltz,* 245 Pa.Super. 139, 142–44, 369 A.2d 332, 334 (1976). Accordingly, when the lower court would be warranted in giving binding instructions to the jury, *see, e.g., Connelly v. Ziegler,* 251 Pa.Super. 521, 523–24, 380 A.2d 902, 903 (1977); *Albright v. Metropolitan Life Insurance Co.,* 143 Pa.Super. 158, 164, 17 A.2d 709, 711 (1941), or when the evidence is insufficient to sustain a verdict against the losing party, *see, e.g., Fitzgerald v. McCutcheon,* 270 Pa.Super. 102, 105–06, 410 A.2d 1270, 1271 (1979); *Szumski v. Lehman Homes, Inc.,* 267 Pa.Super. 478, 480–81, 406 A.2d 1142, 1143 (1979); *Trawick v. Nationwide Mutual Insurance Co.,* 242 Pa.Super. 271, 274–75, 363 A.2d 1265, 1266–67 (1976), the court should enter a judgment n.o.v.

*McCloskey v. New York Life Insurance Company,* 292 Pa.Super. 1, 5, 436 A.2d 690, 691–92 (1981).

By this test, there can be no question that the evidence was sufficient to show that the two statements in question were false and defamatory. The jury was entitled to accept appellee's testimony that he had been given permission to make the grave marker, and to reject the testimony of Campbell, Donatelli, and Desport that he had not been, from which it follows that the jury was entitled to find that appellee was not a thief. This conclusion, however, does not dispose of the issue of punitive damages. On that issue, the dispositive questions are: What was Donnelly's state of mind, when he charged appellant with being a thief, and what was Krepp's, when he told other employees that appellee had taken company property without authority and could be indicted? Did either man make his statement "with knowledge of the falsity of its content" or "with reckless disregard of the truth of its content"? *Hepps v. Philadelphia Newspapers, Inc., supra,* 506 Pa. at 331, 485 A.2d at 389. And was the evidence of either man's state of mind "clear and convincing"? *Id.*

To answer these questions we must focus our attention on the evidence of how matters stood as of the July 31st

meeting, when Donnelly charged appellee with being a thief. The evidence on this point is substantially uncontradicted: Donnelly knew that a grave marker had been taken; that this was against both company policy and practice of many years standing; and that a private investigator, engaged on the advice of company counsel, had reported that appellee had taken the grave marker. In addition, Donnelly had received a report from Krepp, his immediate subordinate and the person in charge of the plant's operations; Krepp had met with the foremen and had been told by them that they had never given approval for a grave marker to be made as a personal job. According to appellee's testimony, which we take as true because the jury accepted it, he told Donnelly that Campbell, his foreman, had given him permission to make the marker. Obviously, Donnelly did not believe appellee, or else he would not have rejoined that "[w]e can't have thieves around here....; (stating, in effect, "I don't believe you had permission; I think you stole the marker.") We find no basis for concluding, however, either that Donnelly knew that what he had said was false, or that he said it with reckless disregard of whether it was false.

Appellee contends that "management"—presumably referring to Donnelly and Krepp—should have asked Campbell whether he had given appellee permission to make the grave marker. Supplemental Brief for Appellee at 22. This argument, however, is not persuasive.

It cannot be maintained that Donnelly's failure to ask Campbell shows that he *knew* that his statement to appellee was false. Thus what appellee evidently contends is that Donnelly made his statement *recklessly*. But the evidence refutes, or at least does not support, that contention. An executive who relies on settled company policy, an investigator's report, and the plant manager's report is not acting recklessly. The fallacy of appellee's argument is the assumption—which appellee either does not recognize or does not acknowledge—that if Donnelly *had* asked Campbell whether he had given appellee permission to make the

grave marker, Campbell would have said that yes, he had. Nothing supports this assumption. To the contrary, Campbell testified on cross-examination that appellee had never asked him for permission to make a grave marker. N.T. 127.

Nor can it be maintained that Krepp's failure to ask Campbell whether he had given appellee permission to make the grave marker warrants punitive damages. When Krepp met with the plant foremen, including Campbell, it had not been determined that appellee had taken the marker. It is therefore hardly surprising that Krepp only asked the foremen whether they had given *anyone* permission to take the marker; he had no reason to ask whether *appellee* had been given permission. Appellee argues that after he was dismissed by Donnelly, at the July 31st meeting, "Charlie Krepp, the plant superintendent, without talking to Campbell, then went onto the plant floor and called [appellee] a thief and stated that he could be indicted in front of most all of his colleagues." Supplemental Brief for Appellee at 22. This evidence, however, could not show that Krepp knew that what he was saying was false. As for whether he said it with reckless disregard of whether it was false: Again, as is the case with regard to Donnelly's statement, appellee assumes that if, after receiving the private investigator's report, Krepp had asked Campbell whether he had given appellee permission to take the grave marker, Campbell would have said that yes, he had, and there is no basis in the evidence for that assumption.[5]

5. The trial court states in its opinion that "[i]t is no defense to the punitive damages claim of the Plaintiff that false utterances were made by one set of officials while knowledge of the falsity resided in yet another. The Defendant corporately knew the falsity of the allegations or at a minimum, uttered them with the reckless disregard as to their truth or falsity." Slip op. of tr. ct. at 8. This reasoning is not persuasive. Accepting the fact, as we must, that someone did give appellee permission to make the grave marker, still, knowledge of that fact may not be imputed to appellant for the purpose of determining whether appellee was entitled to recover punitive damages unless it can be said that in giving permission, the person who did so was acting within the scope of his employment. *See Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1278 (3d Cir.1979); *Lake Shore &*

What appellee has done is to confuse his claim for punitive damages for defamation with his claim for compensatory damages for breach of an alleged employment contract. This confusion is manifest in his brief. Thus he contends that he was "made a scapegoat because the [cemetery company] threatened to cancel its business with [appellant]." Supplemental Brief for Appellee at 6. *And see id.* at 18. Whether appellant acted wrongfully in dismissing appellee is a separate issue, which will be discussed next; it has nothing to do with whether Donnelly's and Krepp's defamatory utterances were made in such a way as to warrant an award of punitive damages.

## II.

### The Contract Claim

As was noted at the outset, in describing this appeal, appellee's action alleges breach of a section of appellant's employee handbook that provided that employees could do personal jobs with their supervisor's permission. Appellant argues that appellee's "theory of recovery is simply not applicable to the facts in this case under the law of Pennsylvania." Brief for Appellant at 29. We agree. As will become apparent, what appellee has argued,—apparently without recognizing the fact—is that an employee handbook that *does not provide job security* may be contractually enforced *as if it did* provide job security. Appellee refers to no authorities in support of this proposition, and we are aware of none. Indeed, the proposition is contrary to the

*Michigan Southern Railway v. Rosenzweig,* 113 Pa. 519, 544, 6 A. 545, 553 (1886); Restatement (Second) of Agency § 217C (1958); Restatement (Second) of Torts § 909 (1977). Here, the issue of whether in giving appellee permission, Campbell (or some other employee—Donatelli or Desport) was acting within the scope of his authority was not pleaded, and the jury was not instructed on the point and therefore made no finding of authority. The trial court's resort to the law of agency as supporting the award of punitive damages was therefore unwarranted. In any event, given the extensive testimony that long-settled company policy was that permission to make a grave marker was not to be given, the evidence could not support a finding of authority to give appellee permission to make the marker.

employment-at-will rule, which still is the rule in Pennsylvania.

## -A-

## The Employment-at-Will Rule

■ In Pennsylvania the settled rule is that "[a]bsent a statutory or contractual provision to the contrary, the law has taken for granted the power of either party to terminate an employment relationship for any or no reason." *Geary v. United States Steel Corp.*, 456 Pa. 171, 175, 319 A.2d 174, 176 (1974). This rule, which is often referred to as the employment-at-will rule, originated in the late nineteenth century.[6] The rule has been sharply criticized in recent years by commentators arguing that it gives employers too much discretion and allows them to take unfair advantage of employees. *See, e.g.,* Blades, Employment at Will Vs. Individual Freedom: On Limiting the Abusive

---

**6.** In *Kirk v. Hartman & Co.*, 63 Pa. [13 P.F. Smith] 97, 105 (1870), it was said: "When, indeed, a person is employed as an agent, traveller or salesman, for no definite time, the law does not imply a hiring by the year, but at the will of both parties, and the principal has a right to terminate it at any time and to discharge the agent from his service without notice." *See also Henry v. Pittsburgh & Lake Erie Railroad Co.*, 139 Pa. 289, 297, 21 A. 157, 158 (1891), where the Court held that an employer "may discharge an employee with or without cause, at pleasure, unless restrained by some contract." The employment-at-will rule appears to have developed in a piecemeal fashion, being applied first to professional workers and somewhat later to "menial domestic & husbandry servants": " 'No doubt,' as it is said in [*Coffin v. Landis,* 10 Wright 426], 'there is a class of contracts for the employment of servants where the law presumes the contract to intend a yearly or monthly employment though nothing is said of the duration of service.' " *Kirk v. Hartman & Co., supra.* The obligation of the master to provide for his servant during the planting and harvesting seasons, as well as during the winter, was stated by Blackstone:

> If the hiring be general, without any particular time limited, the law construes it to be a hiring for a year; upon a principle of natural equity, that the servant shall serve, and the master maintain him, throughout all the revolutions of the respective seasons, as well when there is work to be done as when there is not.
>
> 1 Blackstone Commentaries 425.

*See also* Chitty, The Law of Contracts Not Under Seal 588 (1855). *See generally* Feinman, The Development of the Employment at Will Rule, 20 Am.J.L.Hist. 118 (1976).

Exercise of Employer Power, 67 Colum.L.Rev. 1406 (1967); Summers, Individual Protection Against Unjust Dismissal: Time for a Statute, 62 Va.L.Rev. 481 (1976); Note, Protecting At-Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith, 93 Harv.L.Rev. 1816 (1980); Note, Implied Contract Rights to Job Security, 26 Stan.L.Rev. 335 (1974). In response to such criticism, the courts in some States have in effect abrogated the rule by implying into all employment contracts a term imposing on the employer the duty to dismiss an employee only in good faith and for just cause. *See, e.g., Gates v. Life of Montana Insurance Co.*, 196 Mont. 178, 638 P.2d 1063 (1982); *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974) *modified in Howard v. Dorr Woolen Co.*, 120 N.H. 295, 414 A.2d 1273 (1980); *Cleary v. American Airlines, Inc.*, 111 Cal.App.3d 443, 168 Cal.Rptr. 722 (1980).[7] Other courts have declined to imply a just cause term into employment contracts. *See, e.g., Parnar v. Americana Hotels, Inc.*, 65 Hawaii 370, 652 P.2d 625 (1982); *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081 (1984); *Brockmeyer v. Dun & Bradstreet*, 113 Wisc.2d 561, 335

---

**7.** One commentator has read this court's opinion in *Yaindl v. Ingersoll-Rand Co.*, 281 Pa.Super. 560, 422 A.2d 611 (1980), as in effect abrogating the employment-at-will rule by implying a just cause requirement into employment contracts. Comment, The Role of Federal Courts in Changing State Law: The Employment At-Will Doctrine in Pennsylvania, 133 U.Pa.L.Rev. 227, 251 (1984).

It is not correct to read *Yaindl* so broadly. Rather, it applied the public policy exception to the employment-at-will rule, which the Supreme Court described in *Geary v. United States Steel Corp., supra,* and which we discuss *infra.* In *Yaindl* we concluded that a dismissal based upon an employer's specific intent to harm the employee "is an example of when a discharge violates public policy." 281 Pa.Super. at 573 n. 5, 422 A.2d at 618 n. 5. · After reviewing the evidence, we were unable to find any public policy implicated in the dismissal. We also concluded, however, that the employee had stated a claim for improper interference with his prospective employment relationship in a separate division of the company on the basis of actions taken by his superiors in threatening certain actions against the separate division's management if it hired the employee. In so concluding we noted that interference with a dismissed employee's future employment "constitutes a far greater infringement upon the employee's right to earn a living than does the manager's discharge of the employee from the manager's own company." 281 Pa.Super. at 585, 422 A.2d at 624.

N.W.2d 834 (1983). A recent and especially helpful discussion and collection of authorities appears in *Woolley v. Hoffmann-LaRoche, Inc.,* 99 N.J. 284, 491 A.2d 1257 (1985).

We need not decide whether to align ourselves with the critics or defenders of the employment-at-will rule. Appellee concedes—as under the evidence he must—that he had no definite term of employment with appellant. He *might* have argued that even though he had no definite term of employment, we should not apply the employment-at-will rule but should instead decide to abrogate the rule. We need not decide whether *Geary* would preclude such a decision, for appellee has *not* so argued. Accordingly, his claim must be dismissed—unless he has pleaded and proved that he is within one of the exceptions to the rule.

### -B-

### Exceptions to the Employment-at-Will Rule

In recent years both the Congress and State legislatures have created statutory exceptions to the employment-at-will rule.[8] In addition, the Supreme Court and this court have developed as a matter of common law a public policy exception to the rule.

In *Geary v. United States Steel Corporation, supra,* the Supreme Court stated that "there are areas of an employee's life in which his employer has no legitimate interest", and that "[a]n intrusion into one of these areas might plausibly give rise to a cause of action, particularly where some recognized facet of public policy is threatened." 456 Pa. at 184, 319 A.2d at 180. Relying on *Geary,* we have held that a public employer may not deny employment on the basis of a conviction for which the offender has been pardoned, unless the conviction was reasonably related to fitness for the job, *Hunter v. Port Authority of Allegheny*

8. *See, e.g.,* 42 U.S.C.A. § 2000e–1 to –15 (1981) (Title VII of the Civil Rights Act of 1964); 29 U.S.C.A. § 623 (1975) (Age Discrimination in Employment Act); 43 P.S. § 955 (Supp.1985) (Human Relations Act, prohibiting discrimination in employment on the basis of race, age, sex, handicap or disability).

*County,* 277 Pa.Super. 4, 419 A.2d 631 (1980), and that an employer may not discharge an employee because he accepts jury service, *Reuther v. Fowler & Williams, Inc.,* 255 Pa.Super. 28, 386 A.2d 119 (1978). *See also Yaindl v. Intersoll-Rand Co., supra,* 281 Pa.Super. at 577, 422 A.2d at 620 (in reviewing order dismissing claim for wrongful discharge, "we must weigh several factors, balancing against appellant's interest in making a living, his employer's interest in running its business, its motive in discharging appellant and its manner of effecting the discharge, and any social interests or public policies that may be implicated in the discharge.").[9]

Appellee neither pleaded nor proved that his case is within any statutory exception to the employment-at-will rule, or that it is within the public policy exception. We must therefore inquire whether he has shown that for some other reason the rule is inapplicable.

■■■ When, as in this case, an employment arrangement does not contain a definite term, it will be presumed that the employment-at-will rule applies. The employee may, however, be able to overcome the presumption:

> The burden is on the plaintiff ... to overcome the presumption by showing facts and circumstances establishing some tenure of employment. The intention of the parties governs. One relying on the contract as provid-

---

9. *Geary* was one of the first cases to recognize the public policy exception to the employment-at-will rule. A recent article has cited twenty-two jurisdictions that have now adopted this exception. Lopatka, The Emerging Law of Wrongful Discharge—A Quadrennial Assessment of the Labor Law Issue of the 80's, 40 Bus.Law. 1, 6–7 n. 30. *See, e.g., Monge v. Beebe Rubber Co.,* 114 N.H. 130, 316 A.2d 549 (1974), *modified in Howard v. Dorr Woolen Co.,* 120 N.H. 295, 414 A.2d 1273 (1980) (discharge for refusal to accede to sexual advances of supervisor violates public policy); *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 417 A.2d 505 (1980) (discharge for refusing to violate code of professional ethics against public policy); *Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 610 P.2d 1330, 164 Cal.Rptr. 839 (1980) (dismissal for refusal to participate in illegal price fixing scheme contrary to public policy); *Trombetta v. Detroit, Toledo & Ironton R.R.,* 81 Mich.App. 489, 265 N.W.2d 385 (1978) (dismissal for refusal to alter pollution control reports in violation of state law against public policy).

ing for a reasonable length of time must establish something in the nature and circumstances of the undertaking which would create the inference that a definite or reasonable period of employment was contemplated.

*Cummings v. Kelling Nut Co.*, 368 Pa. 448, 451–52, 84 A.2d 323, 325 (1951) (citations omitted).

The question therefore arises whether appellee carried his burden of proof.

Sometimes proof of consideration, when added to proof of services to be rendered, has been sufficient to establish that the employment was not at-will but for a term. *Compare Lucacher v. Kerson*, 158 Pa.Super. 437, 45 A.2d 245, *aff'd* 355 Pa. 79, 48 A.2d 857 (1946), (plaintiff's resigning former position in New York to join Philadelphia firm and his plans to move his family to Philadelphia supports promise of "permanent employment") *with Cummings v. Kelling Nut Co., supra* (when after nine years' employment employee claims that he and employer had agreed that his employment would continue for as long as necessary to compensate him for expenditures made in the business during the first years of employment, employment nevertheless held to have been at-will, Court noting that plaintiff's claim might have been "more plausible" if he had been required to give up another business activity).

Appellee, however, neither pleaded nor proved any consideration other than his services to appellant. Thus, if he is to escape the employment-at-will rule, he must look elsewhere.

In recent years some courts have held that the employment-at-will rule is inapplicable where the employer has issued an employee handbook containing a provision that commits the employer to dismiss an employee for just cause only, and that an action will lie for breach of such a provision. *See, e.g., Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980); *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn. 1983); *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 443 N.E.2d 441, 457 N.Y.S.2d 193 (1982). It would, however, be

improper for us to decide whether we agree with the reasoning of these decisions. Indeed, it would be mere *dictum*, for nowhere in the employee handbook issued by appellant is there a provision that commits appellant to dismiss an employee for just cause only—nor did appellee plead or argue any such provision. The employee handbook cases, therefore, are irrelevant to this case. In another case we may, or may not, decide to permit recovery for breach of a commitment made by the employer in an employee handbook, but this case does not present that issue.

The evidence and the theory of appellee's case have already been discussed at some length, in examining the issue of punitive damages for defamation. At this point it is enough to recall that the basis of appellee's breach of contract action is that the employee handbook issued by appellant contained a provision stating that an employee could "use our [appellant's] equipment and waste material for your [the employee's] personal work" if given permission by a supervisor. Appellant's evidence was that making a grave marker was not "personal work", but the jury accepted appellee's evidence that it was; appellant's evidence also was that Campbell, one of appellee's supervisors, had not given appellee permission to make the grave marker, but the jury accepted appellee's evidence that he had. Appellee's argument, accepted by the trial court, is that to dismiss him for doing what he was given permission to do was unjust: "he [was] made a scapegoat because the Resurrection Cemetery threatened to cancel its business with [appellant]." Supplemental Brief for Appellee at 6.

■ There is no merit to this argument. To be sure, according to *appellee*, and according to the *jury*, Campbell gave appellee permission to make the grave marker. But according to *appellant*, Campbell did *not* give permission. Given the jury's verdict, we may take it as fact that Campbell did give permission. But that fact is irrelevant. Appellant's handbook nowhere provided that an employee would be dismissed *only if the facts warranted it*. *If* the

handbook had contained, if not expressly at least by clear implication, a just cause provision, *then* appellee's claim might have merit; [10] indeed, it *would* have merit if this court were to decide to accept and follow the reasoning of cases such as *Toussaint v. Blue Cross & Blue Shield of Michigan, supra.* But as we have said, that is a decision that must await a case in which the action is brought for breach of a just cause provision.[11] Since here the handbook did not contain, expressly or by clear implication, any just cause provision, appellee has shown nothing to take his case out of the settled employee-at-will rule. As an employee-at-will, he could be dismissed, as he *was* dismissed, because *appellant believed* that he had made the grave marker without permission and knowing that to make it was against long-settled company policy. Whether appellant's belief was

**10.** Appellant's employee handbook does contain a section entitled "Disciplinary Action", which provides that "[b]efore a permanent employee is dismissed, the case is carefully considered by at least two supervisors." In addition, the handbook contains grievance procedures. Neither of these provisions, however, is the basis of appellee's claim for wrongful discharge; nor, it may be added, is this surprising, for the record reveals that appellee's case was reviewed by two supervisors, Donnelly, who was in charge of manufacturing in all six of appellant's plants, N.T. 145, and Krepp, who was in charge of the plant in which appellee worked. N.T. 144.

**11.** In *Richardson v. Cole Memorial Hospital,* 320 Pa.Super. 106, 466 A.2d 1084 (1983), an employee sued for breach of a provision in an employee handbook that stated that the employer would "provide continual employment to all employees whose work proves satisfactory;" the handbook further provided disciplinary procedures and grievance procedures. *Richardson* is different from the employee handbook cases cited above because it holds that a handbook provision purporting to offer employment as long as an employee's performance is satisfactory is not contractually enforceable. "Such a promise is not.... a promise to discharge for *cause* or good or just cause only." *Toussaint v. Blue Cross & Blue Shield of Michigan, supra,* 408 Mich. at 620, 292 N.W.2d at 895. It is instead hardly a promise at all, for the term "satisfactory" presumes that the employee's "work [must] prove[ ] satisfactory" to the employer, leaving the employer with discretion to determine what measure of performance is satisfactory. In contrast, the promise to discharge only for cause provides an objective measure by which to evaluate the dismissal: What was the reason for the dismissal, and in the circumstances did the reason amount to just cause? *See Toussaint v. Blue Cross & Blue Shield of Michigan, supra* at 619, 292 N.W.2d at 895.

*correct—i.e.,* in accordance with fact—has nothing to do with the case; that it has nothing to do with the case is of the essence of appellee's status as an employee-at-will, who may be dismissed "for any or no reason." *Geary v. United States Steel Corp., supra.*[12]

The judgment is affirmed so far as the award of $15,000 compensatory damages for defamation is concerned. Otherwise it is reversed.

ROWLEY, J., files a concurring and dissenting Statement.

BECK, J., files a concurring and dissenting opinion in which JOHNSON, J., joins.

ROWLEY, Judge, concurring and dissenting:

I join in Part I of the majority's Opinion relative to the defamation claim. However, I join in that portion of Judge Beck's Concurring and Dissenting Opinion relative to the contract claim. Therefore, like Judge Beck, I would affirm the judgment.

12. The trial court instructed the jury that a "contract by estoppel" might be found if the jury concluded that appellant had received permission to make the grave marker. The court may have had the doctrine of promissory estoppel in mind when it gave its instruction. While our courts have applied that doctrine when *consideration* for a promise is absent, *see, e.g., Cardamone v. University of Pittsburgh,* 253 Pa.Super. 65, 384 A.2d 1228 (1978), the doctrine does not provide a basis for relief when, as is the case here, a *promise* is absent. It has been suggested that the doctrine of promissory estoppel may provide a basis for an employee's recovery for commitments made in an employee handbook. *See, e.g., Woolley v. Hoffmann-LaRoche, Inc., supra* 99 N.J. at 303 n. 9, 491 A.2d at 1267 n. 9; DeGuisseppe, The Effect of the Employment-at-Will Rule on Employee Rights to Job Security, 10 Fordham Urb.L.Rev. 1, 44 (1981). We are not persuaded by the suggestion. Recovery on the theory of promissory estoppel, is ordinarily limited to recovery of amounts lost and expended in reliance on the promise, *see, e.g., Hoffman v. Red Owl Stores,* 26 Wis.2d 683, 133 N.W.2d 267 (1965), in order to place the plaintiff in the position he would have occupied had the promise never been made. *See* Fuller and Perdue, Reliance Interest in Contract Damages, 46 Yale L.J. 52, 56 (1936). In addition, the question arises whether any reliance on the asserted promise was justified. If the employer has placed no limit on its freedom of action, the promise would seem illusory only. *See* Murray, Murray on Contracts 149 (2d ed. 1974).

BECK, J., concurring and dissenting:

## Factual Background

Banas began his employment with Matthews as a sandblaster (Record at 6a) and advanced to the position of tooler, which he held for 14 or 15 years preceding his discharge (Record at 17a). It was undisputed that Banas was a skilled craftsman and his job performance was good (Record at 120a). In fact, Banas had been selected to work on an important job for Matthews, the making of Elvis Presley's grave marker (Record at 19–20a).

After he was hired, Banas received from Matthews a copy of a booklet entitled "Matthews—You and Your Company." This employee handbook contained the following provision relating to personal jobs:

Employees are not generally permitted to work on personal jobs during company time or on company premises. However, supervisors will often cooperate by giving permission for you [the employee] to use our equipment and waste material for your personal work.

There was testimony at trial that doing personal jobs, euphemistically called "government jobs," was a commonplace event at the Matthews plant. Banas' immediate supervisor, Jack Campbell, testified that he had never turned down a request for permission to do a "government job."

Banas asked for and received permission to do a personal job using a sheet of scrap bronze from the company shop. There is conflicting testimony on whether Banas told his supervisors, when making the request, that the personal job in question was a grave marker. Campbell, the immediate supervisor, who acknowledges that the request was made, maintains that he did not know that Banas intended to make a grave marker. He stated that he believed, when granting permission, that Banas had in mind a small item such as a license plate or house numbers which were the customary items made by employees for their own use, after permission was obtained. Banas maintains that he told Campbell that he wanted to make a grave marker. Banas acknowledges that he also used a bronze vase from company stock

as part of the marker. He asked a secretary (one in a nonsupervisory position) for permission to use the vase.

At trial the vice-president of the company, the plant manager, and the general foreman testified that Matthews employees may not make grave markers for personal use. The company policy is to sell grave markers only to cemeteries, not to individuals. Record at 272a, 275a, 294a, 299a, 324a. A document, "Bronze Division Procedures," offered in evidence by Matthews, stated:

> There has been some vagueness and misunderstanding about our policy in connection with the sale of bronze memorials to employees. If we permit employees to purchase bronze memorials directly from Matthews for the installation at any cemetery it presents difficulties and misunderstandings with our customers [cemeteries]. For the good of all concerned it should be thoroughly understood that we cannot run the risk of offending our customers by permitting employees to buy direct from Matthews. Every employee who desires to purchase a bronze memorial should contact the cemetery office and arrange for said purchase. There is no objection if the employee indicates to the cemetery that he or she is an employee of Matthews. The employee should also make certain that the official order is being placed through the cemetery.

Record at 274–75a.

This document was distributed only to those in managerial and supervisory positions at Matthews and not to personnel on Banas' level. Record at 299a.

Matthews learned from Resurrection Cemetery that a Matthews grave marker had been installed without sale through the cemetery. Matthews then conducted a private investigation and determined that while at work, Banas had made the marker from company materials and had then removed the marker from the company premises. During a meeting between Banas and Matthews supervisory personnel involved with the investigation of the grave marker's manufacture and removal, a Matthews supervisor, Francis

Donnelly, said, "We can't have thieves around here." Record at 53a. Based upon the investigation, Banas' employment with Matthews was terminated.

Following Banas' termination, the plant superintendent, Charles Krepp, spoke with Banas' former co-workers who were concerned because of Banas' sudden departure. Krepp told them that Banas had been fired for unauthorized taking of company property, that Banas violated the law as well as company rules, and that Banas could have been indicted on criminal charges.

## Punitive Damages

I dissent from the majority because I find that a review of the record reveals that more than enough evidence was adduced under the clear and convincing test to create a question for the jury as to whether Banas should have been awarded punitive damages.[1]

Applying the actual malice standard to the present case, I find sufficient evidence of record which, believed by the jury, would establish Matthews' actual malice by clear and convincing proof and entitle Banas to punitive damages. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Hepps v. Philadelphia Newspapers, Inc.*, 506 Pa. 304, 485 A.2d 374 (1984), *appeal pending*, —— U.S. ——, 105 S.Ct. 3496, 87 L.Ed.2d 628 (1985). Hence, I would affirm the trial court's denial of Matthews' motion for a judgment n.o.v. which alleged that there was inadequate evidence upon which to submit the punitive damages

1. An additional point of divergence is the majority's reliance on *Rutt v. Bethlehems' Globe Publishing Co.*, 335 Pa.Super. 163, 484 A.2d 72 (1984), as support for the proposition that negligence is the proper standard for determining if a conditional privilege to defame has been abused. While I agree that negligence is the appropriate standard, I find that the relevant and natural precedent for that proposition is found in *Hepps v. Philadelphia Newspapers, Inc.*, 506 Pa. 304, 485 A.2d 374 (1984), *appeal pending*, —— U.S. ——, 105 S.Ct. 3496, 87 L.Ed.2d 628 (1985). *Rutt* expressly limits its discussion to the *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), privilege as applied to media defendants while *Hepps* does not. *Hepps* contains broad language about the abuse standard applicable to all possible conditional privileges recognized under Pennsylvania law.

issue to the jury. *See Heffernan v. Rosser,* 419 Pa. 550, 215 A.2d 655 (1966).

Preliminarily, I note that the question is not whether as thirteenth jurors, our court would have found actual malice but rather, whether there was evidence in the record from which a rational jury could have found clear and convincing proof of actual malice. *See Hepps; Heffernan; Delahanty v. First Pennsylvania Bank N.A.,* 318 Pa.Super. 90, 464 A.2d 1243 (1983).

Because in addressing this question our court is deciding whether the trial court erred in denying Matthews' motion for a judgment n.o.v. on punitive damages, the record must be reviewed in the light most favorable to Banas as the verdict-winner below. *Dambacher v. Mallis,* 336 Pa.Super. 22, 485 A.2d 408 (1984). "[A]ny doubts should be resolved in favor of the verdict." *Tyus v. Resta,* 328 Pa.Super. 11, 17, 476 A.2d 427, 430 (1984). Accordingly, our court must accept as fact that which the jury obviously found in holding Matthews liable for defamation, namely, that Banas was given permission to make the grave marker and that Matthews supervisory personnel made false statements about Banas' being a thief.

With respect to the award of punitive damages, the inquiry must focus on the knowledge and state of mind of the Matthews supervisors (Messrs. Krepp and Donnelly) who uttered the defamatory remarks about Banas. Because at worst the Matthews supervisors received conflicting information on whether Banas had received permission to make a marker, I conclude that the jury could not have found that the Matthews supervisors *knowingly* made false statements about Banas. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). However, because the contradictory information about Banas' having permission raised serious doubts concerning Banas' being a thief, and because despite such conflicting data, Matthews did not question Banas' immediate supervisor (Jack Campbell) about whether he gave Banas permission to make a grave marker, I also conclude that the jury

could reasonably have found that the Matthews supervisors exhibited a *reckless disregard* for the truth by avowing that Banas was a thief. *See St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

The majority reasons that Donnelly could not have been acting with actual malice when he made the "We can't have thieves around here" statement because he must have disbelieved Banas' protestations that he had permission. But I view Donnelly's state of mind when he made the statement as a question for the jury. Clearly, Donnelly's words are consistent with disbelief of Banas, but the jury would have to determine whether that apparent disbelief was a reckless disregard of evidence indicating that Donnelly's statement was false.

Central to my analysis are the following salient background facts established by the record: (1) Banas was a good and reliable employee with a twenty-year, unblemished employment record with Matthews; (2) the performance of personal jobs was commonplace within the Matthews plant; (3) there was evidence that the alleged Matthews' policy ("Bronze Division Procedures") prohibiting the construction of a cemetery marker as a personal job was communicated only to supervisory personnel, not to employees like Banas, and finally, (4) when Banas was questioned, he did not deny making the marker with company material.

A discussion of the significance of these facts is required. Since Matthews' supervisors had been instructed that Matthews' employees were to obtain grave markers only by purchasing them from cemeteries, any supervisor who gave an employee like Banas permission to make a marker as a personal job would be acting improperly. The jury could infer that a supervisor who gave such permission would be motivated to deny it to protect himself. Since this inference is a matter of common-sense reasoning, the jury could charge Krepp and Donnelly with a like understanding of the circumstances.

Krepp and Donnelly knew that Banas did not deny making the marker. The jury could have inferred that they acted recklessly in defaming Banas and that they were in part motivated to select Banas as an example for other employees as part of a general crackdown on personal jobs.

With regard to Matthews' investigation of the specific Banas marker incident, although the record contains conflicting evidence, the jury could have found that Banas' immediate supervisor (Campbell) was never asked whether he had given Banas permission to make the marker. Moreover, the testimony of the private investigator hired by Matthews to investigate the incident, Nicholas Domek, supports Banas' side of the story. Domek testified at trial that he was asked to determine who made the marker and in the course of his investigation he spoke with Mr. Logue, Banas' brother-in-law and father of the deceased. Logue then called Banas on the telephone and allowed Domek to speak to him. Banas, speaking directly to Domek, admitted making the marker, stated he had permission and said he had no objection to the use of his name in Domek's report to Matthews.[2] *See* Record at 206a–13a. The jury could have found that Matthews' supervisory personnel (Krepp and Donnelly) were aware of Domek's report and therefore knew that Banas freely admitted making the marker with the knowledge that his employer would receive the report. There was also evidence in the record that Banas did not attempt to conceal the marker in the plant while he was making it, that it was left in plain view on his workbench, and that he carried it out of the plant under his arm covered only with some brown paper to prevent scratching. From these facts the jury could infer first that Banas clearly felt

2. These are the only facts which Domek reported concerning whether Banas had permission for the marker, and these facts support Banas' version of the incident. Nevertheless, the majority asserts that Krepp and Donnelly could rely on the investigator's report to support their belief that Banas stole a grave marker. Actually, Domek was instructed merely to discover *who* made the marker, not whether *permission* was given for the marker to be made as a personal job. Thus, I do not regard the investigator's report as in any manner supportive of a belief that Banas was a thief.

he had nothing improper to hide and second that the Matthews supervisors could be charged with the knowledge that Banas had acted in a manner totally inconsistent with his having stolen the marker.

In holding that Banas has not made a case for punitive damages sufficient to go to the jury, the majority finds that the trial judge erred in not granting Matthews' motion for judgment n.o.v. The case law is clear that judgment n.o.v. should be entered only when the facts are such that no two reasonable persons could disagree that the verdict was improper. *Cummings v. Nazareth Borough*, 427 Pa. 14, 233 A.2d 874 (1967). In light of the litany of evidence produced at trial supporting the inference that Matthews' supervisory personnel (Donnelly and Krepp) acted recklessly in defaming Banas, the majority's conclusion that the question of punitive damages should not be presented for jury consideration is in my view untenable.

The majority states that Banas' claim is predicated upon the assumption that Campbell, Banas' immediate supervisor, would have admitted giving Banas permission to make a marker as a personal job. I maintain that such an assumption is irrelevant to the question whether Krepp and Donnelly acted with reckless disregard for the truth (*Sullivan* actual malice) when they labeled Banas a thief. The resolution of the question does not depend on what Campbell would have said but on whether Donnelly and Krepps could be viewed as acting with reckless disregard for the truth because they defamed Banas without first asking Campbell whether Banas had permission to make a marker.

The majority acknowledges that the evidence of record could support a finding that Campbell was never asked if he had given Banas permission to make a marker as a personal job.[3] Yet the majority argues that such evidence is insuffi-

---

3. Because the record could easily support a finding that Campbell was never asked whether he had given Banas permission for a marker, I do not agree with the majority's assertion that "Krepp met with the foremen and had been told by them that they had never given approval for a grave marker to be made as a personal job." This assertion is, at the very least, partially contradicted by Campbell's

cient to raise a jury question as to the reckless publication of the defamatory remarks concerning Banas. The jury could have found that when confronted with conflicting stories about Banas' having permission for a marker, Krepp and Donnelly acted with reckless disregard for the truth by branding Banas a thief without having first inquired of Campbell whether Banas had received permission to make the marker.

Consequently, I would hold that there existed sufficient evidence in the record to allow the jury to decide whether, by clear and convincing proof, defamatory statements about Banas were uttered with reckless disregard for their truth or falsity.[4] Accordingly, I would not disturb the punitive damages award.

Like the majority I would hold that *Sullivan* actual malice is the appropriate standard for gauging whether a plaintiff in a defamation action is entitled to punitive damages. *Geyer v. Steinbronn*, (Nos. 02639–02641 Philadelphia 1982, filed December 6, 1985). However, I find the majority's punitive damages analysis incomplete because the ma-

testimony that he was never asked if he had given Banas permission to make a marker as a personal job.

4. A corporation is bound by its agent's acts if the agent acted within his express, implied or apparent scope of authority. *Lokay v. Lehigh Valley Cooperative Farmers, Inc.*, 342 Pa.Super. 89, 492 A.2d 405 (1985). Therefore, a corporation may be "held liable for punitive damages solely on the basis of vicarious liability" for the acts of its agent. *Dean Witter Reynolds, Inc. v. Genteel*, 346 Pa.Super. 336, 499 A.2d 637 (1985); *Philadelphia Traction Co. v. Orbann*, 119 Pa. 87, 12 A. 826 (1888). " 'Apparent authority' arises when a corporation permits its agent to assume a certain power or authority, or represents him as having it." *Lokay*, 342 Pa.Super. at 98, 492 A.2d at 409. In the present case, the Matthews employee handbook stated that "supervisors will often cooperate by giving permission for [employees] to use [Matthews] equipment and waste material for [employees'] personal work." Thus, the Matthews handbook conveyed at the least apparent, if not express, authority on Banas' supervisor(s) to give Banas permission for a personal job. Accepting, as this court must, the jury's determination that Banas received permission from a supervisor to make the grave marker, I would affirm the trial court's conclusion that Matthews was vicariously liable for the defamatory remarks of its agents (Krepp and Donnelly) since Banas could not be deemed a thief if he acted with a supervisor's permission.

jority fails to consider the recent United States Supreme Court decision, *Dun & Bradstreet v. Greenmoss Builders,* 472 U.S. ——, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985).

Because an award of punitive damages in a defamation action in effect penalizes speech,[5] the determination of the appropriate criterion for such an award necessarily mandates an examination of the United States Supreme Court's opinions discussing the dynamic tension between the First Amendment guarantee of free expression and the States' interest in allowing private individuals to protect their reputations.

In *Gertz* the United States Supreme Court declared that "the States may not permit recovery of presumed or punitive damages ... when liability is not based on a showing of knowledge or falsity or reckless disregard for the truth," i.e., on a showing of *Sullivan* actual malice. *Id.,* 418 U.S. at 349, 94 S.Ct. at 3011. But in a later opinion, *Dun & Bradstreet,* the United States Supreme Court restricted the scope of *Gertz* by stating that "recovery of presumed and punitive damages in defamation cases absent a showing of 'actual malice' does not violate the First Amendment when the defamatory statements do not involve matters of public concern."[6] *Dun & Bradstreet,* 472 U.S. at ——, 105 S.Ct. at 2948, 86 L.Ed.2d at 605. The majority's opinion in the case sub judice neither cites *Dun & Bradstreet* nor addresses the punitive damages standard delineated in *Dun & Bradstreet.*

---

**5.** *See* R. Sack, *Libel, Slander, and Related Problems* 349 (1980).

**6.** Justice Powell announced the judgment of the Court in an opinion joined by Justices Rehnquist and O'Connor. The Chief Justice concurred on the ground that *Gertz* did not apply because the allegedly defamatory statements did not relate to a matter of public concern. In his separate opinion, Justice White agreed with Justice Powell that inasmuch as the case sub judice did not involve a matter of public concern, *Gertz* was not controlling. Justice White then reiterated his position that *Gertz* should be overruled and that common-law defamation principles should govern plaintiffs who are neither public officials nor public figures. Thus, although *Dun & Bradstreet* is a plurality decision, it represents a majority viewpoint on the standard for awarding punitive damages in defamation cases which do not concern matters of public interest.

Since the present appeal does not involve speech on a matter of public concern, our court is not constitutionally required to gauge the award of punitive damages in the case sub judice by application of the *Sullivan* actual malice test. *Dun & Bradstreet.* Nevertheless, I conclude that actual malice is the proper standard for awarding punitive damages.

To date, Pennsylvania defamation law on punitive damages in non-public interest cases has been inconsistent. For example, in a case involving a private plaintiff and a private defendant, *Laniecki v. Polish Army Veterans Association*, 331 Pa.Super. 413, 423, 480 A.2d 1101, 1106 (1984), we "observe[d] that Pennsylvania has embraced Section 908 of the Restatement (Second) of Torts" which allows punitive damages upon proof of "outrageous conduct," i.e., an act done with an evil motive or with reckless indifference to the rights of others. *See Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742 (1984) (non-defamation case in which the Pennsylvania Supreme Court resolved the punitive damages issue according to Section 908 of the Restatement (Second) of Torts). Thereafter, in *Walder v. Lobel*, 339 Pa.Super. 203, 488 A.2d 622 (1985), we departed from the Restatement approach and cited *Hepps* for the proposition that punitive damages are justified in defamation cases only upon a demonstration of actual malice.

In the present appeal, the majority also quotes *Hepps* as controlling authority for use of the *Sullivan* actual malice standard for punitive damages. Although I regard *Hepps* as instructive on the punitive damages question, I do not believe *Hepps* is entirely apposite to the case sub judice. The Pennsylvania Supreme Court's decision in *Hepps* predates the United Supreme Court's opinion in *Dun & Bradstreet.* *Hepps* is explicitly based on the United States Supreme Court's *Gertz* opinion which required proof of actual malice to justify a punitive damages award to a private figure plaintiff in a suit against a media defendant. *Hepps*, 506 Pa. at 329, 485 A.2d at 388. Neither *Gertz* nor *Hepps* distinguishes for purposes of punitive damages be-

tween defamation actions involving public concerns and those involving private concerns. *See Dun & Bradstreet.* Moreover, the defamatory speech in *Hepps* involved a matter of public interst [7] (five investigative articles printed in a newspaper of general circulation) whereas the defamatory remarks in the instant case, like those in *Dun & Bradstreet* (defamatory statements made in a credit report issued to five Dun & Bradstreet subscribers), concern a matter of solely private interest.

Despite inconsistent Pennsylvania precedent and the freedom under *Dun & Bradstreet* to establish a standard other than actual malice, I nevertheless conclude that punitive damages cannot be obtained without proof of *Sullivan* actual malice. *Geyer.*

I endorse the actual malice norm because I am convinced that the goals sought to be achieved through defamation law are better served by the *Sullivan* actual malice standard than by the common-law malice standard of Section 908 of the Restatement. *See Geyer.*

Both the Restatement common-law malice (ill-will malice, outrageous conduct) and *Sullivan* actual malice delineate behavior more egregious than the ordinary negligence needed to establish the underlying tort liability in private plaintiff-private defendant defamation cases. *See Delahanty.* Common-law malice of the type described by Section 908 of the Restatement refers to the defendant's attitude toward the plaintiff whereas actual malice as outlined in *Sullivan* refers to the defendant's attitude toward the truth. *See Hepps;* Note, *Punitive Damages and Libel Law,* 98 Harv. L.Rev. 847 (1985).

Therefore, the inquiry becomes which type of conduct to punish and deter through the vehicle of punitive damages, i.e. whether to punish a defendant because he publishes outrageously or with ill will or whether to punish a defendant because he lacks respect for the truth and thereby

---

7. Since *Hepps* involved a matter of public concern, the actual malice standard for punitive damages would apply to *Hepps* under either the reasoning of *Gertz* or *Dun & Bradstreet.*

harms the plaintiff. *See Delahanty.* The common-law malice of the Restatement connotes intent to harm the plaintiff and involves behavior which is morally blameworthy. *See* J. Sales, *Punitive Damages: The Doctrine of a Bygone Era* at 5–6 (1984), citing Ellis, *Fairness and Efficiency in the Law of Punitive Damages*, 56 S. Cal.L. Rev. 1, 21–22 (1982). *Sullivan* actual malice centers on the defendant's awareness of the falsity or probable falsity of his defamatory utterance and the defendant's choice to publish defamatory remarks despite recognized risks.

In the context of actual malice, a defendant makes a defamatory statement with a reckless disregard for the truth or falsity of his statement if the defendant entertains serious doubts about the truth of his statement. *St. Amant.* Therefore, the defendant's knowingly or recklessly publishing a defamatory falsehood, i.e. the defendant's exhibiting *Sullivan* actual malice, requires a high level of scienter and evidences the defendant's deliberate decision to publish defamatory remarks for his own advantage regardless of the high risk of harming the plaintiff's reputation.

Whereas common-law malice may result from an irrational hatred, actual malice may stem from a choice to proceed despite risks. Courts and laws cannot realistically deter a defendant from disliking a plaintiff, but they can encourage a defendant to exercise sufficient care in making public pronouncements about a plaintiff.

Therefore, I agree with the majority that actual malice is the appropriate standard for awarding punitive damages in a defamation action that does not involve a matter of public concern. *Geyer.*

### The Contract Claim

Unlike the majority, I conclude that Banas placed squarely before the Superior Court the issue of whether the Matthews handbook modified his at-will employment status. Banas argued that it did and that Matthews discharged him in breach of the handbook for making, with permission, a grave marker as a personal job.

I find the majority's opinion lacks clarity. On the one hand, the opinion appears to hold that Banas was an at-will employee who could be fired for any reason or no reason and that the question of the handbook is not before the court. The majority opinion concludes, "The employer handbook cases, therefore, are irrelevant to this case." At 484.

On the other hand, the majority's opinion examines the effect of the handbook by stating,

"Appellant's [Matthews'] handbook nowhere provided that an employee would be dismissed *only if the facts warranted it. If* the handbook had contained, if not expressly at least by clear implication, a just cause provision, *then* appellee's [Banas'] claim might have merit; indeed, it *would* have merit if this Court were to decide to accept and follow the reasoning of cases such as *Toussaint v. Blue Cross & Blue Shield of Michigan, supra.* But as we have said, that is a decision that must await a case in which the action is brought for breach of a just cause provision."

At 484–485 (emphasis in original) (footnotes deleted). I do not understand the majority's injection of just cause dismissal language. The majority introduces the just cause issue sua sponte. I can only conclude that the majority's just discussion is purely advisory. The parties never raised the issue of a just cause dismissal and the majority has found that the employee handbook is not before the court and therefore refuses to determine if the handbook in any way modified Banas' at-will status. Since the majority declines to rule on the effect of the handbook in the instant appeal, I assume that in a later case if this court decides the issue whether a handbook can modify conditions of employment, the court would not be bound by the advisory just cause dicta in the majority's present opinion.

Contrary to the majority's analysis, I hold, as did the trial court, that the Matthews' employee handbook is clearly an issue in this case. It is only the majority's unique interpre-

tation of the facts in this case that excludes the majority's consideration of the handbook.

Although the Matthews' employee handbook does not establish job security for Banas with respect to a specified tenure (length) of employment, the handbook acts as a framework in which to examine Banas' at-will-employment status. Just as prior court decisions have carved out public policy exceptions to the at-will-employment doctrine, *see, e.g., Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980); *Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975); *Yaindl v. Ingersoll-Rand Co.,* 281 Pa.Super. 560, 422 A.2d 611 (1981), this court could, if it chose, permit at-will-employment status to be modified on the basis of the contractual effect of an employee handbook. I believe that Banas has today presented this court with the precise question whether provisions in an employee handbook can alter at-will-employment status so that an employer cannot discharge an employee for actions that complied with the provisions of the employee handbook.[8]

Matthews contends that Banas could be discharged at any time, for any reason irrespective of the provisions of the Matthews' employee handbook. For this reason, Matthews contests the propriety of the trial court's following jury instructions:

> If an employer puts out a book and tells a fellow he can do a personal job, even though they say work must be performed on company orders, they do have an exception. If the employee goes and gets permission he's permitted to do the particular job and then he turns around and is fired, even though this isn't part of any contract signed by anybody the company as a matter of right cannot put

8. Employers' statements of specific policies, practices, and treatment in employee handbooks have been enforced against employers as contractual rights by various courts. *See, e.g., Wolk v. Saks Fifth Avenue Inc.,* 728 F.2d 221 (3rd Cir.1984); *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081 (1984). This is what Banas seeks—enforcement of a particular promise about permission for personal jobs, which promise appears as a provision in Matthews' employee handbook.

that man out on the sidewalk, there's a breach of contract created by estoppel....

Record at 436a.   The court further charged the jury: Now let's assume that you believe there is indeed a breach of contract here.   Now, to apply the doctrine of equitable estoppel, ... [w]e have no written contract here, but as a matter of equity a contract is created in the law if these certain conditions exist: That is Matthews made the statement concerning personal jobs, which was a condition of employment, ... and that [Banas] establishes to your satisfaction that Banas could reasonably rely on that.

Record at 440a.

Banas concedes that he was generally an at-will employee in the sense that he had no contractual right to a specified duration of employment.   But he argues that this status should not place him at the caprice of his employer.   I agree with Banas and would hold that his at-will status was modified by the Matthews' employee handbook provisions which formed the basis of a unilateral contract limiting the employer's power to terminate the employee.

### The Employee Handbook as Unilateral Contract

It is hornbook law that when a party makes a promissory offer which invites acceptance by performance rather than by return promise, the rendering of the requested performance creates a completed unilateral contract. *See* Restatement (Second) of Contracts § 45 and Comment (a) thereunder (1981).   In the employment context, the distribution to an employee or employees of a handbook detailing certain rights, policies and procedures constitutes a unilateral offer of an employment contract with those conditions.   The employee supplies the necessary acceptance of the offer and consideration by continuing to perform the duties of his job. *See, e.g., Southwest Gas Corp. v. Ahmad,* 99 Nev. 594, 668 P.2d 261 (1983) ("Her continued employment after formal delivery of the handbook provides sufficient consideration for modifying the employment agreement by inserting the

handbook provisions."); Comment, *Employment-at-Will in Pennsylvania: Employee Manuals Provide Contract Remedies for Discharged Employees*, 58 Temple L.Q. 243 (1985).

The same considerations of fairness and equity which have led many of our sister states [9] to reject the position that "an employee handbook on personnel policies and procedures is a corporate illusion 'full of sound ... signifying nothing,'" *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 462, 443 N.E.2d 441, 443, 457 N.Y.S.2d 193, 195 (1982), likewise compel me to conclude that employers' statements of policy and procedure contained in handbooks distributed to employees should be accorded contractual significance.

Employers derive substantial benefits in personnel relations from the use of employee handbooks. Comment, *supra*, at 262. "The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly." *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 613, 292 N.W.2d 880, 892 (1980); *see also Weiner*, 57 N.Y.2d at 465–66, 443 N.E.2d at 445, 457 N.Y.S.2d at 197 (plaintiff rejected other job offers relying on job security provisions of handbook and was instructed to follow handbook when dealing with employees he supervised); *Thompson v. St. Regis Paper*

**9.** At least thirteen states now recognize contract claims based on the terms of an employee handbook. *See, e.g., Salimi v. Farmers Insurance Group*, Colo.App., 684 P.2d 264 (1984); *Staggs v. Blue Cross of Maryland*, 61 Md.App. 381, 486 A.2d 798 (1985); *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980); *Pine River State Bank v. Mettille*, Minn., 333 N.W.2d 622 (1983); *Morris v. Lutheran Medical Center*, 215 Neb. 677, 340 N.W.2d 388 (1983); *Southwest Gas Co. v. Ahmad*, 99 Nev. 594, 668 P.2d 261 (1983); *Woolley v. Hoffmann-LaRoche, Inc.*, 99 N.J. 284, 491 A.2d 1257 (1985); *Hillis v. Meister*, 82 N.M. 474, 483 P.2d 1314 (1971); *Weiner v. McGraw-Hill Inc.*, 57 N.Y.2d 458, 443 N.E.2d 441, 457 N.Y.S.2d 193 (1982); *Langdon v. Saga Corp.*, 569 P.2d 524 (Okla.Ct.App.1976); *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081 (1984); *see also* Comment, *The Role of the Federal Courts in Changing State Law: The Employment at Will Doctrine in Pennsylvania*, 133 U.Pa.L.Rev. 227, 245 n. 94 (1984).

*Co.,* 102 Wash.2d 219, 685 P.2d 1081 (1984) ("[W]e hold that if an employer ... creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship."). Improved employee relations and better morale increase productivity which in turn increases profitability. Therefore, it is just to require the employer to fulfill the expectations of fair treatment he has created.[10]

Characterizing an employee handbook as a unilateral offer of employment, takes into account the employer's concern to augment, modify and even withdraw the offer contained in the handbook in response to the employer's changing needs and circumstances. When an employer distributes a new handbook or portion thereof, the employer makes a new offer of employment. The terms of the new offer are defined by the contents of the new handbook, and the new offer becomes effective on the date the new handbook is distributed. Or, when a handbook is withdrawn, i.e. revoked, the new offer becomes effective on the date that the employer notifies the employee of the revocation of the handbook. Employees accept the new offer and provide consideration by continuing their employment. *See Pine River State Bank v. Mettille,* Minn., 333 N.W.2d 622 (1983). The Minnesota court viewed this procedure as offering an advantage to employers who can thereby avoid the transaction costs of contracting separately with each employee. *Id.* Moreover, under this analysis an employer remains free to issue statements which are not contractually binding, so long as such statements are accompanied with an appropriate, conspicuous disclaimer. *See Woolley v. Hoffmann-LaRoche, Inc.,* 99 N.J. 284, 491 A.2d 1257 (1985)

---

**10.** For further discussion of the policy considerations which support giving contractual significance to employee manuals, see Comment, *Employment-At-Will in Pennsylvania: Employee Manuals Provide Contract Remedies for Discharged Employees,* 58 Temple L.Q. 243, 259–66 (1985).

("All that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual.").

I conclude that the provisions of a handbook distributed to employees can constitute an offer of a unilateral contract which an employee may accept by remaining on the job, and that once accepted, the provisions of the handbook are binding on both parties as conditions of employment until modified by a subsequent offer and acceptance of new conditions. Therefore, I would hold that the trial court did not err in instructing the jury that the Matthews' employee handbook could be construed as part of an employment contract between Banas and Matthews, and that the conduct of Matthews could be considered a breach of contract. The trial court described the contract arising from the handbook as a "contract by estoppel." Although it would have been preferable if the trial court had conceptualized the handbook as a unilateral contract, the trial court's charge does not constitute reversible error. In determining on appeal whether a trial court's instructions are erroneous, the appellate court must examine the charge as a whole, and isolated inaccuracies are not grounds for reversal if the charge as a whole is not misleading or prejudicial. *Ackerman v. Delcomico,* 336 Pa.Super. 569, 486 A.2d 410 (1984). Since the charges on the significance to be accorded the employee handbook were predicated on a contract theory, and were thus correct as a whole, the jury's verdict need not be disturbed on these grounds. Since Matthews raises no other challenges to that portion of the jury's verdict which awarded Banas damages for breach of contract, I would affirm that portion of the judgment.

### Conclusion

I find no merit in any of Matthews' allegations of error. Consequently, I would affirm the trial court.

JOHNSON, J., joins in this opinion.