499 A.2d 637

**DEAN WITTER REYNOLDS, INC., Appellant,**

**v.**

**Joseph M. GENTEEL and Cheryl L. Genteel. (Two Cases)**

**DEAN WITTER REYNOLDS, INC.**

**v.**

**Joseph M. GENTEEL and Cheryl L. Genteel, Appellant.**

Superior Court of Pennsylvania.

Argued April 17, 1985.

Filed Oct. 11, 1985.

338

William E. Taylor, III, Philadelphia, for Dean Witter Reynolds, Inc.

Edward J. McKarski, Easton, for Joseph M. and Cheryl L. Genteel.

Before WICKERSHAM, BECK and CERCONE, JJ.

WICKERSHAM, Judge:

Before us are consolidated cross-appeals from two orders of the Court of Common Pleas of Northampton County.

Appellant in Nos. 2466 and 2763 Philadelphia 1984 is Dean Witter Reynolds, Inc. [hereinafter "Dean Witter"]. Appellants in No. 2786 Philadelphia 1984 are Joseph and Cheryl Genteel.

This non-jury case began as a mortgage foreclosure action brought by Dean Witter against the Genteels. The mortgage at issue was given by the Genteels after a check issued to Dean Witter by the Genteels' corporation, J.C. & C. Coins, Inc., bounced. Subsequently, the Genteels asked the lower court to void the mortgage on the basis of fraud and/or duress, and counterclaimed for damages due to the trading losses suffered by J.C. & C. Coins in the commodities future market.

To understand this case, we must examine the prior relationship between Dean Witter and the Genteels. In the early 1970's, Joe Genteel became interested in collecting coins. In approximately 1978, he began purchasing and selling scrap gold and silver, and during 1979, he netted substantial profits from the buying and selling of scrap metal. In early 1980, the Genteels did two things of interest herein: they formed a corporation, J.C. & C. Coins, Inc., and they left their home in Roseta, Pennsylvania, for a vacation in Hawaii. While in Hawaii, they became acquainted with Mr. Jack Leslie, a fellow vacationer from Omaha, Nebraska. It so happened that Mr. Leslie was a commodities broker in gold and silver and an employee of Dean Witter. Upon exchanging information about their respective jobs, Mr. Leslie suggested to the Genteels that they set up a "hedging account" with Dean Witter, to protect their silver inventory.

After their return to Roseta, Joe Genteel contacted Mr. Leslie in Omaha and discussed silver prices and opening a hedging account. Ultimately, the Genteels decided to open a hedging account for J.C. & C. Coins, Inc. at Dean Witter, with Mr. Leslie as their account representative. What occurred in the next three months was disputed at trial, but the lower court found that:

7. ... [S]everal forms were sent from Mr. Leslie to the Genteels who signed them where X's appeared, and returned them, in blank, to Mr. Leslie, along with a check for $20,000.00. The account was opened in the name of J.C. & C. Coins, Inc., based on Mr. Genteel's existing inventory of 2,000 ounces of silver.

8. The forms returned by the Genteels were completed at the Omaha, Nebraska office with inaccurate information. Most particularly, the commodity account information held out J.C. & C. Coins, Inc. as a smelter, refiner and producer of coins, with a net worth of $1,440,000.00 and net income in excess of $200,000.00. [The Genteels] did not receive copies of the forms sent to Omaha. Other forms and disclosure statements sent to the [Genteels] were not read by them.

9. [Dean Witter] allowed trading to commence April 21, 1980, without verification as to the accuracy of the information on the account application. Mr. Genteel continued to call Mr. Leslie on a regular basis following the opening of the account, but stopped opening and reading daily and monthly reports sent to him by [Dean Witter] because he didn't understand them.

10. Mr. Genteel relied on and trusted the handling of his account by Mr. Leslie, and when asked to send him $10,000.00 on a margin call the end of April, did so. On or about May 14, 1980, [Dean Witter] received a Dunn & Bradstreet report informing it that the information in the commodity account application could not be verified. In spite of this, the account remained open and active.

11. While the account was active, Mr. Genteel's silver inventory did not exceed 5,000 ounces. Mr. Leslie exercised control over trading in the account except for two contracts each near the end of April and May. The trading in the account was excessive in light of [the Genteels'] investment objectives.

12. Analysis of the trading in the account of J.C. & C. Coins, Inc., reveals the following:

(a) the account was opened April 21, 1980, and closed June 5, 1980;

(b) there was a closing debit balance of Sixty-One Thousand Nine Hundred Nine and 96/100 ($61,909.96) Dollars;

(c) there were profits of Fifty-Three Thousand Six Hundred Two and 20/100 ($53,602.20) Dollars and losses of One Hundred Forty Two Thousand Nine Hundred Twenty ($142,920.00) Dollars;

(d) commissions were paid in the amount of Seven Thousand Eight Hundred Ninety ($7,890.00) Dollars and fees in the amount of Ninety-Two and 75/100 ($92.75) Dollars indicating a total loss of Ninety-Seven Thousand Three Hundred and 55/100 ($97,300.55) Dollars;

(e) there were ninety-three (93) total contracts of which forty-five (45) were purchased on the Mid-American Board and forty-eight (48) on the Chicago Board;

(f) there were eleven (11) day trades;

(g) the average length of position was 1.7 days.

13. On May 21, 1980, [the Genteels] were required to liquidate stock they owned to meet a margin call on their account. The amount credited to the account was $3,375.00. The next day Mr. Leslie was instructed by Mr. Genteel not to do any further trading.

14. However, trading continued, and on May 30, 1980, Mr. Leslie instructed [the Genteels] that a margin call on their account required funds in the amount of $46,000.00 by the end of the day, and requested defendants to deliver a check in that amount to the Allentown office of Dean, Witter. [The Genteels] indicated that there were insufficient funds in their account to cover such a check. Mr. Leslie responded that the check would not be negotiated until it could be covered by Mr. Genteel's liquidation of his silver inventory.

15. Contrary to [the Genteels'] understanding, the check was immediately deposited and returned to [Dean Witter] on June 5, 1980, marked "NSF." [Dean Witter] liquidated [the Genteels'] account resulting in a loss of

$61,909.96. Thereafter, [Dean Witter] informed [the Genteels] that [it] could pursue various legal actions against them, including criminal action.

16. The Genteels sought counsel and paid $15,000.00 towards the loss in their account. Then they executed the mortgage, which is the subject matter of this proceeding, for $46,909.96 on June 25, 1980. The first payment of $10,000.00 was made during the following month.

17. Thereafter, the [Genteels] repudiated the mortgage, and the instant proceeding ensued.

Lower ct. op., February 10, 1984, at 3–6.

After trial, the lower court granted rescission and voided the mortgage on Dean Witter's action of mortgage foreclosure. It also entered a verdict in favor of the Genteels on their counterclaim and against Dean Witter in the amount of $58,375.00 in compensatory damages and $175,-125.00 in punitive damages. Dean Witter filed exceptions to the verdict. When argument was taken on the exceptions, the court also heard argument on whether delay damages and/or prejudgment interest should be added to the verdict. On August 16, 1984, the court dismissed Dean Witter's exceptions, and awarded the Genteels delay damages of $15,272.75, and interest at 12% from March 24, 1981 [the date that the Genteels filed their counterclaim]. Final judgment in the total amount of $272,550.83 was entered on September 25, 1984.

On appeal, Dean Witter raises the following issues:

1. Did the court below err in holding that there was sufficient probative evidence to support the finding that the commodity account in question had been "churned"?

2. Did the court below err in permitting Mr. Genteel to refresh his recollection from notes made after litigation was commenced and at least two years after the events at issue?

3. Did the court below err in not permitting the broker's supervisor to testify to the absence of prior complaints lodged against the broker?

4. Did the court below err under existing Pennsylvania law or under Section 909 of the Restatement (Second) of Torts, in holding Dean Witter Reynolds, Inc., vicariously liable for punitive damages?

5. Did the court below err in awarding both prejudgment interest and delay damages under Rule 238 Pa.R. C.P.?

Brief for Dan Witter at 3. In addition, the Genteels ask whether the lower court properly calculated the amount of the prejudgment interest awarded them. Brief for Genteels at 1.

After careful consideration of the record, the briefs of the parties, and having had benefit of oral argument, we conclude that the lower court properly found that the account of the Genteels was churned by appellant. The opinion of the Honorable Richard D. Grifo, dated February 10, 1984, adequately addresses this issue and we see no need to address it further.

Appellant argues that the lower court erred in permitting Joe Genteel to refresh his recollection from notes made after the litigation was commenced and at least two years after the events at issue. This occurred on the first day of trial, November 8, 1983, during Mr. Genteel's direct examination. Mr. Genteel was testifying about the events surrounding the establishment of and the early transactions in the hedging account. When asked about specific phone conversations between himself and Mr. Leslie which occurred on April 28, 1980, he stated what he remembered, but noted that he could not presently recall the entire series of phone calls that day. At his counsel's suggestion, he was permitted to examine some notes concerning the phone calls, which he had dictated to his wife about a year and a half prior to trial. Mr. Genteel testified that after his wife wrote down his statements, he examined the notes and found them to be accurate. The court then allowed him to review the notes, whereupon he stated that his recollection was refreshed, and he then continued to testify from memory.

■ Despite its surface appeal, we find that, upon closer examination, the caselaw in Pennsylvania does not support Dean Witters' position. It is well settled that a witness whose memory is exhausted may use any writing or other aid to refresh or revive his or her present recollection of past events. *Commonwealth v. Payne,* 455 Pa. 503, 317 A.2d 208 (1974); *Commonwealth v. Lamb,* 309 Pa.Super. 415, 455 A.2d 678 (1983). "The proper procedure for a party to refresh his own witness's recollection is to show the writing, or other evidence, to his witness and after the witness's recollection is refreshed, to proceed with *direct examination* and have the witness testify from present recollection." *Commonwealth v. Payne, supra,* 455 Pa. at 506, 317 A.2d at 210. The witness, however, must testify from present, albeit refreshed, memory, and not from the writing itself. *Commonwealth v. Canales,* 454 Pa. 422, 311 A.2d 572 (1973). Therefore, a witness may use a memorandum or other aid for the purpose of refreshing his memory even though the writing itself may not be competent evidence. *Commonwealth v. Weeden,* 457 Pa. 436, 322 A.2d 343 (1974), *cert. denied,* 420 U.S. 937, 95 S.Ct. 1147, 43 L.Ed.2d 414 (1975); *Panik v. Didra,* 370 Pa. 488, 88 A.2d 730 (1952); *In re Reiter,* 173 Pa.Super. 552, 98 A.2d 465 (1953); *Lardieri v. Lamont,* 172 Pa.Super. 35, 92 A.2d 229 (1952).

It is this last point that helps distinguish refreshing recollection from the other rule governing the use at trial of a witness's prior writing: past recollection recorded. The latter rule permits a prior writing to be admitted into evidence, if it meets certain conditions. *See Nationwide Mutual Insurance Co. v. Hassinger,* 325 Pa.Super. 484, 473 A.2d 171 (1984). On the other hand, in the process of refreshing recollection, the witness testifies orally on his or her *present* refreshed memory; the underlying writing is not admitted into evidence, and thus need not be admissible. *Commonwealth v. Canales, supra. See generally, McCormick on Evidence* § 9 (3d ed. 1984). In *Commonwealth v. Proctor,* 253 Pa.Super. 369, 385 A.2d 383 (1978), our court

discussed whether a foundation must first be established before a party can use the rule permitting a witness to refresh recollection, and we adopted the following three part test:

> To permit the use of a writing in order to refresh the memory of a witness, the proponent must show: (1) that the witness' present memory is inadequate; (2) that the writing could refresh the witness' present memory; and (3) that reference to the writing actually does refresh the witness' present memory.

*Id.*, 253 Pa.Superior Ct. at 373, 385 A.2d at 385 (quotations omitted). *Accord, Commonwealth v. Lamb, supra; Commonwealth v. Wilson,* 296 Pa.Super. 264, 442 A.2d 760 (1982), *modified,* 498 Pa. 529, 447 A.2d 1381 (1982).

■ We are satisfied that the Genteels provided the foundation required by *Proctor.* Mr. Genteel testified that his present memory was inadequate and that the memorandum could refresh his present memory. Once he reviewed the memorandum, his memory was actually refreshed. Since the memorandum was not admitted into evidence but was used only to refresh Mr. Genteel's recollection of the April 28, 1980 phone calls, there was no need for the memorandum to meet the more stringent qualifications of *Nationwide Mutual Insurance Co. v. Hassinger, supra.*[1]

Dean Witter next argues that the lower court erred in not permitting it to introduce evidence to establish an absence of customer complaints regarding Jack Leslie. During his direct examination of Mr. Leslie's former supervisor at Dean Witter, counsel for Dean Witter attempted to question the supervisor as to whether there were any complaints about Mr. Leslie, presumably from other customers. Fol-

---

**1.** Even if we were to find that the use of Mr. Genteel's notes to refresh his memory during his direct testimony was improper, the admission of such evidence was harmless. The witness had already testified generally as to the events of April 28, 1980 before he reviewed his notes. After he reviewed his notes, he was able to add only a few details to what he had already testified. Thus, the testimony given by Mr. Genteel after reviewing his notes was basically testimony corroborating his prior testimony about the April 28 transactions.

lowing objections by the Genteels' counsel and an off the record, side-bar discussion, the objections were sustained on the basis that any prior complaints by other customers were not relevant to the issue of how Mr. Leslie treated the Genteels' account.

■ Questions concerning the admission or exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent a clear abuse of that discretion. *Lewis v. Pruitt*, 337 Pa.Super. 419, 487 A.2d 16 (1985), *Gallegor by Gallegor v. Felder*, 329 Pa.Super. 204, 478 A.2d 34 (1984). Furthermore, not only must a clear abuse of discretion be shown, but there must be a showing that actual prejudice has occurred. *Lewis v. Mellor*, 259 Pa.Super. 509, 393 A.2d 941 (1978). Dean Witter cannot convince us that any actual prejudice occurred by the exclusion of the evidence. Dean Witter was allowed to ask the witness whether he had ever received any complaints from Mr. Genteel concerning the handling of his account. He answered in the negative and added that when the witness met Mr. Genteel in May 1980, Mr. Genteel said he "was very happy about the way the account was handled." N.T. 580. It was this testimony that was valuable to Dean Witter's case; the fact that other customers were happy or unhappy with Mr. Leslie's methods would have added very little to its position. Thus, we cannot find a clear abuse of discretion in the lower court's exclusion of this evidence.[2]

2. In addition, Dean Witter failed to make an offer of proof of what it hoped to elicit from the questions excluded by the court. While we can assume that Dean Witter was attempting to elicit that the supervisor had never received any customer complaints concerning Mr. Leslie, there is absolutely no mention of that on the record. It is long-established that where an objection to a question asked of a witness is sustained, it is essential to put in the record an offer of proof of the relevant facts desired to be proved by the refused testimony, so that the reviewing court can consider the relevancy of the evidence and whether the refusal to receive it was harmful. *Cockcroft v. Metropolitan Life Ins. Co.*, 133 Pa.Super. 598, 3 A.2d 184 (1938). *See Commonwealth v. Peterson*, 271 Pa.Super. 92, 412 A.2d 590 (1979).

■ Dean Witter argues next that the lower court erred in imposing punitive damages upon it. It is well settled that the decision of whether to award punitive damages and the amount to be awarded are within the discretion of the fact finder, in this case the trial judge. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243 (1983).

■ Pennsylvania has adopted section 908 of the Restatement (Second) of Torts and the comments thereunder regarding the imposition of punitive damages. *Martin v. Johns-Manville Corp.*, 508 Pa. 154, 494 A.2d 1088 (1985); *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742 (1984); *Laniecki v. Polish Army Veterans Association*, 331 Pa.Super. 413, 480 A.2d 1101 (1984). Punitive damages are defined by section 908(1) as damages other than compensatory or nominal, awarded against a person to punish him for outrageous conduct and to deter him and others like him from similar conduct in the future. Section 908(2) provides that:

> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

Thus, punitive damage are proper when the act "imports insult or outrage, and is committed with a view to oppress or is done in contempt of plaintiffs' rights.... Punitive damages may be given when the act is done with reckless indifference, as well as, bad motive." *Delahanty v. First Pennsylvania Bank, N.A., supra,* 318 Pa.Super. at 129–30, 464 A.2d at 1263. Punitive damages must be based on conduct which is malicious, wanton, reckless, willful, or oppressive. *Feld v. Merriam, supra; Chambers v. Montgomery,* 411 Pa. 339, 192 A.2d 355 (1963). The imposition of damages to punish a civil defendant is appropriate only where the conduct complained of is especially egregious.

*Martin v. Johns-Manville Corp., supra.* We must look to the act itself, together with the circumstances, including the motive of the wrongdoers and the relations between the parties. *Id.* "The state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." *Feld v. Merriam, supra,* 506 Pa. at 396, 485 A.2d at 748.

After a careful reading of the testimony, we are not convinced that punitive damages were imposed upon Dean Witter solely on the basis of Jack Leslie's churning actions. There is evidence that other persons or departments within the organization were not completely free from blame in this incident. Even if we assume *arguendo,* however, that Dean Witter was held liable to the Genteels for punitive damages solely on the basis of vicarious liability of its agent, this is entirely consistent with Pennsylvania law as it now stands. Back in 1886, our supreme court held that a corporation is liable for punitive damages for the act of its servant. *Lake Shore & Michigan Southern Ry. Co. v. Rosenzweig,* 113 Pa. 519, 6 A. 545 (1886). This rule was reiterated by the supreme court in *Philadelphia Traction Co. v. Orbann,* 119 Pa. 87, 12 A. 826 (1888) and *Funk v. Kerbaugh,* 222 Pa. 18, 70 A. 953 (1908), and by our court in *Gerlach v. Pittsburgh Ry. Co.,* 94 Pa.Super. 121 (1928), *Hannigan v. S. Klein's Department Store,* 1 Pa. D & C 3d 339 (1976), *aff'd per curiam,* 244 Pa.Super. 597, 371 A.2d 872 (1976), and most recently in *Delahanty v. First Pennsylvania Bank, N.A., supra.*[3]

Although we have adopted section 908 of the Restatement (Second) of Torts, we have not adopted the standard of section 909 of the same Restatement, which limits an employer's liability for punitive damages imposed for the

**3.** Federal courts applying Pennsylvania law have also considered whether an employer can be held liable for punitive damages for his employee's act. In *Skeels v. Universal C.I.T. Credit Corp.,* 335 F.2d 846 (3d Circ.1964) and *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (3d Cir.1979), the courts answered yes. However, in *Carpenter v. Dizio,* 506 F.Supp. 1117 (E.D.Pa.1981), *aff'd.,* 673 F.2d 1298 (3d Cir. 1982), the court apparently chose not to follow the traditional Pennsylvania rule.

torts of his employee. *Id.* Dean Witter argues that the trend is clearly away from the traditional, less restrictive rule in favor of section 909, and cites for us a number of states which have adopted by caselaw or statute section 909. While we concur with the supreme court's admonition that the rule allowing punitive damages on the basis of vicarious liability be applied with great caution, *see Philadelphia Traction Co. v. Orbann, supra* and *Funk v. Kerbaugh, supra,* we are not convinced that this is the right time or court to abandon the traditional rule. Therefore, we decline Dean Witter's invitation to adopt section 909.

■ Applying the traditional rule to the instant case, we cannot say that the lower court abused its discretion in awarding punitive damages against Dean Witter. The record clearly supports the court's finding that the injury inflicted upon the Genteels was a result of its broker's activities which, at best, reflected a reckless indifference to the investment objectives of the Genteels. Since a reckless indifference to the rights of others and conscious action in deliberate disregard of them may provide the necessary state of mind to justify punitive damages, we find no abuse of discretion herein.

Finally, Dean Witter argues that the court erred in awarding both prejudgment interest and Rule 238 delay damages. We agree with this contention. While Pa.R.C.P. No. 238 does not specifically label its delay damages "prejudgment interest" as such, it has been deemed a juridical rule of prejudgment interest. *Laudenberger v. Port Authority of Allegheny County,* 496 Pa. 52, 436 A.2d 147 (1981), *appeal dismissed sub nom, Bucheit v. Laudenberger,* 456 U.S. 940, 102 S.Ct. 2002, 72 L.Ed.2d 462 (1982); *Daset Mining Corp. v. Industrial Fuels Corp.,* 326 Pa.Super. 14, 473 A.2d 584 (1984). The language of subsection (g) of the rule lends support to this interpretation:

(g) This rule shall not apply to

(1) ...

(2) pending actions in which damages for delay are allowable in the absence of this rule.

Subsection (g) is a pending action clause. The comments to Rule 238, 8 Pa.Bull. 2669 (1978), explain its purpose:

[The rule will not] apply to any pending actions for damages to property in which damages for delay are already allowable under prior decisions of the Court, e.g. *Marrazzo v. Scranton Nehi Bottling Co., Inc.*, 438 Pa. 72, 263 A.2d 336 (1970), in which compensation for delay may be allowed in trespass actions for destruction or involuntary conversion of property where the compensation can be measured by market value or other definite standards. These pending cases will be disposed of under the standards set forth in *Marrazzo, supra.* However, all new actions of the *Marrazzo* character commenced after the effective date of proposed Rule 238 will be governed by the provisions of the rule.

It was the obvious intention of the committee in promulgating Rule 238, to foreclose the awarding of *Marrazzo* type prejudgment interest, and after April 15, 1979, the Rule's effective date, to treat all claims for delay damages in tort actions under a uniform standard. Our court recognized this in *Robert Wooler Co. v. Fidelity Bank*, 330 Pa.Super. 523, 479 A.2d 1027 (1984), in which we stated:

Pursuant to Pa.R.C.P. 238, which became effective April 15, 1979, a plaintiff who recovers a verdict for personal injury, death or property damage is entitled under certain enumerated circumstances to receive an additional award of interest at the rate of ten percent from the date of the complaint.... Delay damages have also been recovered in tort actions when considerations of justice and fair dealing have required it.... Double recovery, however, is not permitted. If there is a recovery of delay damages under Pa.R.C.P. 238, there can be no recovery under common law principles enumerated in *Marrazzo v. Scranton Nehi Bottling Co., supra.*

*Id.*, 330 Pa.Superior Ct. at 538–39, 479 A.2d at 1034–35. *See also, American Enka Co. v. Wicaco Machine Corp.*, 686 F.2d 1050 (3d Cir.1982) (under Pennsylvania law, there

can be no duplication of common law damages for delay and damages awarded under Rule 238).

■ Because the lower court erred in awarding the Genteels both prejudgment interest of $23,778.08 (12% from the date their answer, new matter, and counterclaim was filed), and Rule 238 damages of $15,272.75 (10% per year from the date one year after the accrual of the cause of action), we must vacate the award for prejudgment interest.[4]

We vacate the award of prejudgment interest; in all other aspects, the orders are affirmed.

***

4. Due to our vacation of the prejudgment interest award, we need not address the Genteel's contention that the lower court erred in its calculation of the prejudgment interest award.