# Dillow v. Myers

226

C.P. of Carbon County, no. 00-2100.

*Steven J. Margolis,* for plaintiff.
*Mark Sigmon,* for defendants.

NANOVIC, *P.J.,* November 22, 2005—

## FACTUAL BACKGROUND

On November 5, 1998, at approximately 10:30 a.m., a Culligan water truck owned by the defendant, Funk Water Quality Company, and driven by its employee, the defendant Edward John Myers, rear-ended a truck temporarily parked on the east berm of the Northeast Extension of the Pennsylvania Turnpike in which John Dillow, an employee of the Pennsylvania Turnpike Commission and the plaintiff in these proceedings, was seated. At the time of the accident, plaintiff was acting within the course of his employment as an equipment operator for the commission; the truck in which he was seated had attached to the rear a directional arrow board for traffic control

and was being used on that date for alerting and deflecting oncoming vehicular traffic away from Turnpike Commission employees further up the road.

Prior to the accident, Robert Tierney and Charles Supers, two witnesses to the accident, observed the defendant's vehicle for a distance of almost 20 miles as it traveled northbound on the Turnpike. Both Tierney and Supers were in the same vehicle, Tierney driving and Supers a passenger. During this distance, the two vehicles passed one another several times: when going downhill defendant's vehicle would gather speed and pass Tierney; when going uphill, defendant's vehicle slowed and would be passed by Tierney. Tierney testified that he maintained a steady speed between 60 and 65 mph, the latter being the speed limit, and that when Myers passed him traveling downhill, Myers' speed was "a lot faster" than his. Both Tierney and Supers noted that Myers did not use turn signals when shifting lanes.

Significantly, both Tierney and Supers testified that defendant's vehicle was "listing heavily to the passenger side"—according to Tierney, at an angle of 20 to 30 degrees off level. Myers died of unrelated causes after the accident, however, prior to his death he told an investigator that "the load was so heavy on the right-hand side of his truck that he had to hold the steering wheel to the left to stay in the right lane." In this same statement, Myers stated that "there was 8,000 pounds all on the right side."

After the accident plaintiff learned not only that the truck was heavily loaded on one side—the passenger side—but that the loading racks for holding cylinders in

place on the driver's side were broken.[1] The accident occurred when, after passing a tanker truck, Myers pulled into the right lane and continued going right, off the road, into the rear of plaintiff's truck. Both Tierney and Supers, and a subsequent investigation by the Pennsylvania State Police, noted no evidence of any attempt by Myers to brake prior to the accident.

As a result of the accident, plaintiff sustained injuries to his neck, head, ear, low back and coccyx. Following a six-day jury trial beginning on November 1, 2004, and ending on November 10, 2004, the jury awarded plaintiff compensatory damages in the amount of $271,000 against both defendants, $100 in punitive damages against Myers' estate, and $155,000 in punitive damages against Funk. Both sides have filed motions for post-trial relief which we address in this opinion. An additional motion for delay damages by plaintiff and a motion to mold the verdict by defendants will be addressed separately.

---

1. The cargo being transported consisted of 120 five-gallon bottles of water and approximately 30 cylinders of water softener. The cylinders of water softener were made of steel, weighing approximately 110 to 120 pounds each. Loading racks were used for holding the cylinders in place but the racks on the driver's side were either missing or broken, necessitating the placement of the water softener cylinders exclusively on the passenger's side and water bottles only on the driver's side. Kyle Gery, a former route driver and manager for Funk who now works in Funk's Eaglesville headquarters, stated that the truck would lean to the passenger's side when loaded in this manner. (N.T., vol. I, pp. 171-73, 188-89.) Gery was a passenger in Myers' truck at the time of the accident to familiarize him with the delivery route.

## DISCUSSION

### *Punitive Damages*

The defendant, Funk Water Quality Company, first contends that because its liability is vicarious, it cannot be held responsible for punitive damages greater than those awarded against its agent, servant and employee, the decedent, Edward John Myers.[2] As previously stated,

---

2. Defendants' additional argument that Myers' conduct did not rise to the requisite level of recklessness or outrageousness, and will not support an award of punitive damages, is without merit. "[I]n Pennsylvania, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Hutchison ex rel. Hutchison v. Luddy,* 582 Pa. 114, 124, 870 A.2d 766, 772 (2005) (citing with approval Restatement (Second) of Torts, §500, cmt. a, Types of Reckless Conduct (1965)). Comment a describes two types of reckless misconduct: the first is where the "actor knows, or has reason to know, . . . of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk"; the second is where the "actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so." *Martin v. Johns-Manville Corp.,* 508 Pa. 154, 171, 494 A.2d 1088, 1097 (1985) (plurality) (Although *Martin* was a plurality opinion, its discussion and analysis regarding punitive damages has been approved by our Supreme Court. See *Hutchison,* 582 Pa. at 122, n.7, 870 A.2d at 771 n.7.). "Under Pennsylvania law, only the first type of reckless conduct . . . is sufficient to create a jury question on the issue of punitive damages." *Id.*

This standard for awarding punitive damages has been met in this case: knowing that the truck was heavily loaded with a disproportionate weight on the passenger side because of the broken loading racks, that this load caused the truck to lean dangerously to the right, and that

the jury returned a verdict of $155,000 in punitive damages against Funk and $100 in punitive damages against Myers.

In Pennsylvania, punitive damages can be imposed on an employer based entirely on an employee's conduct even without any direct evidence of misconduct by the employer. *Shiner v. Moriarty,* 706 A.2d 1228, 1240 (Pa. Super. 1998), *appeal denied,* 556 Pa. 701, 729 A.2d 1130 (1998); *Lake Shore & M.S. Ry. Co. v. Rosenzweig,* 113 Pa. 519, 6 A. 545, 553 (1886) ("the [employer] is liable for exemplary damages for the act of its servant, done within the scope of his authority, under circumstances which would give such right to the plaintiff as against the servant were the suit against him instead of the [employer].").[3] The imposition of punitive damages on the employer requires only that the employee's actions must be clearly outrageous, occur within the scope of his employment, and not be done to satisfy a personal motive but in furtherance of the employer's interests. *Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa. Super. 90, 132,

---

to compensate for this change in the truck's center of gravity it was necessary to keep the wheel turned to the left in order to drive in a straight line, Myers nevertheless deliberately drove the truck at a speed and in a manner which posed an unjustifiable and substantial risk to others of which he was aware.

3. Perhaps, in part, because of the harshness of this rule, it is important to note that while public policy prohibits the purchase of insurance coverage to protect against punitive damages attributable to the direct wanton misconduct or recklessness of the employer, an employer can purchase insurance to indemnify itself against vicarious liability for punitive damages. *Butterfield v. Giuntoli,* 448 Pa. Super. 1, 18, 670 A.2d 646, 655 (1995), *appeal denied, sub nom., Butterfield v. Mikuta,* 546 Pa. 635, 683 A.2d 875 (1996).

464 A.2d 1243, 1264-65 (1983). Consistent with this principle, we charged the jury that if it determined that the actions of Myers were reckless, it could award punitive damages against Funk if (a) the recklessness was clearly outrageous; (b) Myers was acting in the scope of his employment and in furtherance of Funk's business; and (c) Myers did not act with malicious intent (N.T., vol. V, p. 203.)

The fundamental question in this case is not so much whether Myers' conduct was "clearly outrageous" and therefore sufficient to impose vicarious liability on Funk for punitive damages by operation of law, but rather whether the amount of punitive damages awarded vicariously against Funk is necessarily circumscribed by the amount of punitive damages awarded against Myers, the party whose direct tortious misconduct was responsible for the accident. Specifically, in this case Funk claims it was error for the court to admit into evidence and permit the jury to consider Funk's conduct and financial status as relevant factors in setting the amount of punitive damages awarded.

Conceptually, the amount of punitive damages awarded in a case is rationally related to the underlying purpose for punitive damages. Punitive damages exist to punish and deter egregious behavior. *Martin v. Johns-Manville Corp.,* 508 Pa. 154, 169, 494 A.2d 1088, 1096 (1985). Once a basis for awarding punitive damages has been established, in determining the size of the award, sufficient to serve this purpose, "the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant" may properly be con-

sidered. *Dean Witter Reynolds Inc. v. Genteel,* 346 Pa. Super. 336, 347, 499 A.2d 637, 642 (1985), *appeal denied,* 514 Pa. 635, 522 A.2d 1105 (1987) (quoting Restatement (Second) of Torts, section 908, and noting that this section and the comments thereunder have been adopted in Pennsylvania).

Funk does not dispute these well-settled principles but argues that when punitive damages are vicariously imposed, the amount imposed vicariously must be confined to the amount awarded against the party primarily responsible. As argued by Funk, only when liability is premised upon the separate and independent misconduct of the employer, whether or not acting in conjunction with the employee's misconduct, is it appropriate for the fact-finder to separately assess the employer's conduct and wealth in determining the amount of punitive damages to be awarded against the employer. In effect, Funk argues that because the purpose of punitive damages is to punish the tort-feasor and to deter him or others like him from similar conduct, if the employer did nothing wrong, and its liability for punitive damages is only vicariously imposed, as a matter of law, the amount of punitive damages awarded against the employer must equal that awarded against the employee.[4]

---

4. At the time of trial, defendants objected generally to any instruction on punitive damages on the basis that the evidence was insufficient to sustain a finding that Myers' conduct was outrageous and would justify such an award against either defendant. At that time, defendants did not voice the further objection, now argued, that in assessing the amount of punitive damages against a vicariously liable employer, only the employee's conduct is at issue and therefore any exemplary award must be based entirely upon the employee's conduct and an assessment of the employee's, not the employer's, wealth. With this in

When carefully considered, at the heart of Funk's argument is a belief that the perceived harshness of Pennsylvania's rule permitting a punitive award against a corporation for an employee's tort in the absence of culpable misconduct by the employer must be tempered by a rule which either (1) restricts the imposition of liability to those situations where the corporation sanctioned its employee's misconduct or was aware that the employee was unfit for his position, or (2) which otherwise limits the employer's liability for punitive damages to the amount awarded against the employee. To the extent Funk argues that any liability for punitive damages vicariously imposed on a principal must be limited as provided in section 909 of the Restatement (Second) of Torts, this standard has never been adopted in Pennsylvania notwithstanding the recognized harshness of the traditional rule. *Dean Witter,* 346 Pa. Super. at 347, 499 A.2d at 643; *Delahanty,* 318 Pa. Super. at 131, 464 A.2d at 1264.[5] To the extent Funk argues that the amount of

mind, it may well be that the defendants' present argument has been waived. *Kelly v. St. Mary Hospital,* 778 A.2d 1224, 1227 (Pa. Super. 2001) (to preserve a claim for review, an appellant's objection must be timely and precise).

5. Section 909 of the Restatement (Second) of Torts provides:

"Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,

"(a) the principal or a managerial agent authorized the doing and the manner of the act, or

"(b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or

"(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or

"(d) the principal or a managerial agent of the principal ratified or approved the act." Restatement (Second) of Torts: Punitive Damages Against a Principal §909 (1965).

punitive damages awarded on the basis of vicarious liability must be computed by application of the section 908 factors to the employee, and not to the employer, this is not the law of this Commonwealth. In *Delahanty,* in upholding the amount of punitive damages vicariously imposed on an employer, the Superior Court specifically approved the fact-finder's taking into account in assessing the amount of damages, "not only the [employer's] wealth but also, the outrageous conduct of the [employer's] officials, their motive, the relationship between the parties, and the nature and extent of the harm to [plaintiff's] businesses." 318 Pa. Super. at 136, 464 A.2d at 1266; see also, *Hannigan v. S. Klein's Department Store,* 1 D.&C.3d 339 (Phila. Cty. 1976), *appeal denied,* 244 Pa. Super. 597, 371 A.2d 872 (1976) (holding that the financial status of a security guard's employer was relevant in assessing the amount of punitive damages vicariously imposed on the employer).

Whether to award punitive damages and the amount to be awarded are within the discretion of the fact-finder. *Dean Witter,* 346 Pa. Super. at 347, 499 A.2d at 642. This discretion should not be sacrificed for the sake of the symmetrical simplicity argued by Funk merely because the principal's liability for punitive damages is vicariously imposed. In those cases where the agent's misconduct was unexpected and unavoidable by the principal, the jury may well determine that the award of punitive damages assessed against both the agent and principal should be the same. In other cases where a management level official's misconduct—even though not independently outrageous—facilitated the employee's actions, the amount of punitive damages awarded against the em-

ployer might fairly exceed those awarded against the employee. There may also be situations in which the financial status of the employee exceeds that of the employer and where it would be contrary to the "plainest principles of justice" to automatically assess the same amount of punitive damages against the principal as against the agent. *Funk v. Kerbaugh,* 222 Pa. 18, 19, 70 A. 953, 954 (1908) (per curiam).

The variables inherent in determining what amount of punitive damages is appropriate are issues of fact, not of law, and for this reason are the proper subject of argument by counsel in their closing to the jury. The jury should be permitted to judge for itself based on the conduct and wealth of each defendant whether to separately assess punitive damages and in what amount. In this case, the jury properly exercised its discretion.

Clearly evident in the jury's award of $100 in punitive damages against Myers' estate was its understanding that because of Myers' death, the penal aspect of punitive damages could serve no useful purpose against him or his estate.[6] Additionally, beyond being advised of Myers' death, the jury had no information as to the

---

6. This fact alone does not preclude an award of punitive damages against an estate. In contrast to compensatory damages whose objective is to make a plaintiff whole, the objective of punitive damages is not to compensate the plaintiff, but to punish the defendant and to deter others from like conduct, "thereby serving a public as well as private interest." *G.J.D. by G.J.D. v. Johnson,* 447 Pa. Super. 340, 347, 669 A.2d 378, 382 (1995), *aff'd sub nom., G.J.D. by G.J.D. v. Johnson,* 552 Pa. 169, 713 A.2d 1127 (1998) (upholding the award of punitive damages against an estate).

financial status of his estate.[7] As to Funk, its conduct in failing to repair the broken racks for almost a year, making it virtually certain that when fully loaded the cargo weight would be unevenly distributed and would cause the truck to tilt to one side, and the conduct of its route manager, who was a passenger in the truck at the time of the accident, in permitting Myers to operate the truck in this condition on November 5, 1999, were proper factors for the jury to consider in assessing the amount of punitive damages against Funk. The jury was also provided relevant information regarding Funk's annual income and net worth. Its award of $155,000 in punitive damages against Funk was neither confiscatory in relation to Funk's net worth and income, nor disproportionate to the amount of compensatory damages awarded.

## Amendment of the Pleadings

Prior to trial, defendants conceded negligence. The only question of liability presented to the jury was whether Myers' conduct rose to the level of recklessness and whether, if reckless, this conduct was attributable to Funk so as to form the basis of an award of punitive damages against the employer. Plaintiff claims that we unduly restricted him in this regard and that under the pleadings and the evidence he was entitled to pursue a

---

7. In chambers, the court was advised that Myers' estate had no assets and was judgment-proof. (N.T., vol. III, p. 66.) That the jury was not advised of this information was not critical to its award of punitive damages against Myers' estate. *Shiner v. Moriarty,* 706 A.2d 1228, 1242 (Pa. Super. 1998), *appeal denied,* 556 Pa. 701, 729 A.2d 1130 (1998) (rejecting the suggestion that evidence of net worth is mandatory to a valid award of punitive damages).

direct claim of reckless misconduct against Funk. We disagree.

Plaintiff commenced his action by complaint on October 25, 2000. The complaint consists of one count, against both defendants. In paragraph 9, an introductory paragraph which precedes the sole count of the complaint, plaintiff asserted in conclusory fashion that Funk was legally liable as a result of its negligence, carelessness and recklessness, and that of its agent, and "for its *negligent* conduct and supervision of the operation of its vehicle." (emphasis added) Paragraph 9 is later incorporated by reference in Count I which, in paragraph 12, significantly and specifically describes the alleged negligence, carelessness and recklessness of both defendants (*i.e.,* Funk and Myers) as being limited to the manner in which defendants' truck was operated.

None of the instances of misconduct outlined in paragraph 12 even remotely suggested that Funk was directly liable for failing to adequately determine whether Myers was fit for employment or to operate a motor vehicle, the factual basis for direct liability later claimed by plaintiff in two amended complaints, filed on December 23, 2003, and December 26, 2003, respectively,[8] and also in a motion filed on November 1, 2004, for reconsideration of our decision granting defendants' preliminary objections to both amended complaints.[9]

---

8. See paragraph 9 of plaintiff's first and second amended complaints.

9. In this motion, plaintiff argued that Funk's alleged recklessness consisted, in essence, of its failure to check Myers' driving record before and subsequent to his employment and, in consequence, allowing Myers' to operate its truck without a valid driver's license. (Mo-

At trial, plaintiff's counsel further explained that it was his intent to prove that Funk's employment and retention of Myers went beyond mere negligence and instead evidenced a wanton disregard for the rights of other

___

tion, paragraph 19.) (Myers' license was apparently suspended on October 27, 1998, nine days before the motor vehicle accident which is the subject of this suit. (N.T., vol. I, p. 52.).) Plaintiff also argued that defendants were bound by a stipulation of counsel dated December 8, 2000, in which the parties agreed that "if at any time during the discovery portion of this case evidence is produced that either one or both of the defendants have acted recklessly, the plaintiff will be permitted to file an amended complaint and include allegations of recklessness and reckless conduct against both defendants, without any opposition from the defendants." (Stipulation of counsel dated December 8, 2000, ¶2.)

We found that in the context of the subject of the stipulation, the original complaint filed by the plaintiff, the stipulation was ambiguous: that the stipulation could mean that any amendment at any time alleging any basis of recklessness by either of the defendants would be permitted or, alternatively, that any amendment alleging reckless misconduct was to be confined by the structure of the original complaint in which the nature of the recklessness alleged was confined to the manner in which the vehicle was operated. When the terms of an agreement are not ambiguous on their face but become so in the context of extrinsic or collateral circumstances, parole evidence is admissible to resolve such latent ambiguity. *Yocca v. Pittsburgh Steelers Sports Inc.,* 578 Pa. 479, 498, 854 A.2d 425, 437 (2004).

Having found ambiguity, the only evidence offered to resolve this uncertainty was that provided by defendants' counsel who testified that the intent of the stipulation was to bar any issue of recklessness from the case, unless evidence of recklessness with respect to the operation of the vehicle was subsequently discovered, and not with respect to any other issue. (N.T., vol. I, pp. 40-44.) On the basis of this evidence, we concluded that it was the intent of the parties to confine any future amendment to the original cause of action stated in the complaint: the manner in which the vehicle was operated. (N.T., vol. I, pp. 61-62.)

In discussing plaintiff's requested amendment, it is important to note that the only evidence of recklessness plaintiff sought to intro-

motorists. To do this, plaintiff intended to prove that had Funk followed its own procedures in the hiring of new employees, it would have discovered that Myers had three previous motor vehicle violations—two more than three years prior to the accident in question, for failing to stop at a red light, the other of an unknown date and basis— and that in July 1998, after he was employed, Myers had a pending license suspension. (N.T., vol. I, pp. 50-55, 58-59.)

With the above in mind, we concluded that plaintiff's request to amend his complaint and to establish a direct cause of action against Funk for alleged reckless misconduct after the statute of limitations had run was an attempt to improperly introduce a new cause of action into the case, prejudicial to Funk, and not simply an amplification of the original cause of action. See *Reynolds v. Thomas Jefferson University Hospital,* 450 Pa. Super. 327, 676 A.2d 1205 (1996), *appeal denied,* 549 Pa. 695, 700 A.2d 442 (1997) (finding that the structure of the

---

duce at trial was that with respect to Funk's employment practices in the hiring and retaining of Myers which, as will be discussed above, did not rise to the level of recklessness. (N.T., vol. I, pp. 49-55.) Only later, in his brief in support of his post-trial motion, did plaintiff argue that Funk's recklessness also consisted of permitting Myers to operate a truck which it knew or should have known was unsafe because of broken water racks which required the water softener cylinders to be loaded on one side of the truck and, when so loaded, caused the truck to tilt to the passenger side. This additional basis for subjecting Funk to direct liability for punitive damages, we find, has been waived. *Spitzer v. Philadelphia Transportation Co.,* 348 Pa. 548, 36 A.2d 503 (1944) (holding that an offer of proof which fails to state what a witness would have said if permitted to testify, fails to protect the record or preserve for review claimed error).

complaint must be examined in ascertaining the true nature of the cause of action asserted and that "a new cause of action arises if the amendment proposes a different theory or a different kind of negligence than the one previously raised or if the operative facts supporting the claim are changed"). We further concluded that even if we permitted plaintiff's proffered evidence, the failure to check the driving record of a prospective employee or to conduct a driver background check does not create such a sufficiently high degree of risk of harm to others as to warrant punitive damages. See *A.T.S. v. Boy Scouts of America,* 13 D.&C.4th 499, 506 (Montgomery Cty. 1992) (plaintiff, a child molestation victim, failed to adequately plead a claim for relief meriting punitive damages where plaintiff failed to assert that the failure to perform a criminal background check of a volunteer was guided by any evil motive or reckless indifference to the safety of others creating a substantial risk to him).[10]

## *Future Medical Expenses*

At trial, plaintiff presented the expert testimony of Dr. Keith Girton, an orthopedist, who testified that the cause of plaintiff's lower back pain was a fractured or separated coccyx, accompanied by ligamentous injuries and scar tissue, and resulting in a condition known as coccydynia.[11] It is in the nature of this condition for the af-

---

10. Moreover, even if plaintiff's evidence was accepted as true, the accident in question was not caused by Myers' failure to stop at an intersection or to have a valid driver's license. Consequently, any misconduct by Funk in its employment of Myers on this basis was irrelevant and would have been highly prejudicial if admitted.

11. Literally, pain of the coccyx. (Girton deposition, p. 11.)

flicted person to experience discomfort, particularly when sitting, and to occasionally experience an irritation or exacerbation of symptoms for which "some medical treatment" can be expected from time to time. (Girton deposition, p. 33.) The condition is considered untreatable and, therefore, permanent.

While noting his belief that future medical treatment would at times be required, Dr. Girton further testified that plaintiff's condition progressively improved when he was treating plaintiff during the period between December 6, 2000 and September 20, 2001, and that when he last saw plaintiff on September 20, 2001, plaintiff had no pain. (Girton deposition, pp. 26-30, 33, 57-58.) As to future medical treatment, Dr. Girton testified only that the type of treatment plaintiff received in the past for acute pain—*i.e.,* as needed chiropractic and emergency room treatment when symptoms flare up—would be appropriate for the future. (Girton deposition, pp. 42-44.) Dr. Girton never testified to the expected frequency, duration or expense of future medical treatment. Nor did Dr. Mathew Kraynak, plaintiff's family physician, who last examined plaintiff on July 23, 2003, and although testifying that plaintiff's back pain was chronic, meaning it was not expected to go away soon, also testified that as of January 27, 2003, plaintiff was using pain medication on a very limited basis. (Kraynak deposition, pp. 52, 81, 83.)

Prior to closing arguments, plaintiff requested an instruction for future medical expenses. See Pa.S.S.J.I. (Civ) 6.01(B). As to the amount of future medical expenses, plaintiff contended that it was appropriate to average the costs of Dr. Kraynak's treatment and the chiro-

practic and emergency room treatment over the two and a half year period between May 9, 2002 and the date of trial (*i.e.,* $3,077.48) and then extrapolate this figure for the balance of plaintiff's life.[12] Plaintiff's counsel pro-

---

12. This figure includes six visits to Dr. Kraynak's office by plaintiff between May 9, 2002, and October 22, 2004, at a cost of $480, chiropractic treatment for acute pain (six visits to Healing Hands in July and August 2003 and six visits in February 2004 at a cost of $825, and eight visits to Cohen Chiropractic in August and September 2004, at a cost of $850), as well as treatment he received at the emergency room of the Geisinger Wyoming Valley Hospital on July 21, 2003, at a cost of $469.91, and on July 29, 2004, at a cost of $452.57. (Plaintiff's exhibit 51(j).)

Not only did the number of times plaintiff received chiropractic and emergency room treatment for acute pain during these periods as evidenced byplaintiff's billings differ from what Dr. Girton testified was appropriate (*i.e.,* three or four occasions in February 2004 and two times a week for two weeks in late July, early August, 2004), the frequency, duration of visits, and cost of treatment varied on each occasion plaintiff received medical care for acute pain. (Girton deposition, pp. 41-42; see also, plaintiff's exhibit 51(j).) The evidence also indicated that between March 6, 2002, and January 27, 2003, a period of 10 1/2 months, plaintiff did not have any visits with Dr. Kraynak and that all visits with Dr. Kraynak after February 2002 were not for treatment, but to refill prescriptions for medication. (Kraynak deposition, p. 80; N.T., vol. II, pp. 150-51.)

Neither Dr. Girton nor Dr. Kraynak testified that the frequency, duration or expense of treatment plaintiff received in the past was the same or similar to that expected in the future. These are not matters of common knowledge, nor was the information provided to the jury on past treatments sufficient for a layperson to reasonably make such inferences about future treatment. Compare *Pratt v. Stein,* 298 Pa. Super. 92, 137, 444 A.2d 674, 698 (1982) (finding evidence sufficient to award future medical expenses for chiropractic treatment for back spasms attributable to plaintiff's use of a cane where, because of permanent nature of injury, plaintiff's need to use a cane in the future would continue and plaintiff's past treatment consisted of more than 120 visits to the chiropractor over a four-year period at a fixed cost per visit: from this information "the jury could reasonably have inferred

posed making this calculation in his closing argument. (N.T., vol. IV, p. 181; vol. V, p. 24.) Plaintiff's requested instruction was denied and is the subject of a post-trial motion.

The burden of presenting sufficient evidence in support of damages is upon the plaintiff. In meeting this burden: " '[a] claim for damages must be supported by a reasonable basis for calculation; mere guess or speculation is not enough.' *Stevenson v. Economy Bank of Ambridge,* 413 Pa. 442, 453-54, 197 A.2d 721, 727 (1964). See also, *Small v. Flock,* 407 Pa. 148, 180 A.2d 59 (1962); *Getz v. Freed,* 377 Pa. 480, 105 A.2d 102 (1954). 'If the facts afford a reasonably fair basis for calculating how much plaintiff's entitled to, such evidence cannot be regarded as legally insufficient to support a claim for compensation.' *Western Show Co. Inc. v. Mix,* 308 Pa. 215, 162 A. 667 (1932)." *Kaczkowski v. Bolubasz,* 491 Pa. 561, 567, 421 A.2d 1027, 1030 (1980).

More specifically, as to future medical expenses:

"It is well-settled that '[a]n item of damage claimed by a plaintiff can properly be submitted to the jury only where the burden of establishing damages by proper testimony has been met.' *Cohen v. Albert Einstein Medical Center,* 405 Pa. Super. 392, 410, 592 A.2d 720, 729 (1991). In the context of a claim for future medical expenses, the movant must prove, *by expert testimony,* not only that fu-

---

that [the plaintiff] would require chiropractic treatment with the same frequency as he had in the past"), *with Baccare v. Mennella,* 246 Pa. Super. 53, 369 A.2d 806 (1976) (finding that prognosis of future duration and treatment for plaintiff's lower back pain was too indefinite to allow jury to consider awarding future medical expenses).

ture medical expenses will be incurred, but also the reasonable estimated cost of such services. *Id.* See also, *Berman v. Philadelphia Board of Education,* 310 Pa. Super. 153, 161-65, 456 A.2d 545, 550-51 (1983). Because the estimated cost of future medical services is not within the layperson's general knowledge, the requirement of such testimony eliminates the prospect that the jury's award will be speculative. *Cohen,* 405 Pa.Super. at 410-11, 592 A.2d at 729." *Mendralla v. Weaver Corp.,* 703 A.2d 480, 485 (Pa. Super. 1997) (en banc). (emphasis added)

In Pennsylvania, although damages need not be proven with mathematical certainty, they must be proven with reasonable certainty. It is incumbent upon plaintiff to "present competent evidence from which the jury can reasonably determine the degree to which future consequences of a present injury are probable and, accordingly, what the amount of any damages award should be." *Martin,* 508 Pa. at 165 n.5, 494 A.2d at 1094 n.5. The evidence must be sufficient to make an intelligent estimate, without conjecture.

While we agree that plaintiff presented sufficient evidence to find that he would require occasional, and apparently sporadic, future medical treatment for acute back pain, and that because of the etiology of this pain it is not possible to predict with certainty when treatment will be required, plaintiff failed to present any expert opinion about the estimated duration or frequency of future episodes of acute pain requiring treatment, that they would be the same or similar to that required in the past, or that the level of care or costs of future medical expenses for this treatment would approximate those which

had occurred in the past. Without this information, to have permitted plaintiff's counsel to average and extrapolate past expenses incurred during an arbitrary time period into an estimate of future costs would have permitted counsel to engage in self-serving speculation and conjecture, which is the antithesis of the requisite degree of probability on which damages must be fairly and intelligently based.

## Closing Arguments

During closing argument, defendant's counsel argued that the loading and tilting of defendant's truck did not create an unsafe or unreasonably dangerous condition, and that, notwithstanding the broken loading racks, the truck had previously been loaded in this same manner and been operated without mishap. (N.T., vol. V, pp. 48-49.) In response, plaintiff's counsel asserted that defendant's logic—"we did it numerous times before without incident, therefore, it can't be reckless"—was flawed and compared the argument to that made by an intoxicated driver involved in a motor vehicle accident who claims his driving was not impaired as evidenced by previous occasions when he had driven in the same condition without incident. (N.T., vol. V, pp. 77-79.) In making this analogy, plaintiff's counsel clearly disclaimed any suggestion that Myers was intoxicated or that alcohol was involved in this litigation. On the issue of recklessness, at one point in his closing argument, plaintiff's counsel implied that Funk routinely places on the road 23 other trucks in a similar condition to that driven by Myers, thus evidencing Funk's deliberate disregard for public safety. (N.T., vol. V, p. 79.)

Defendants timely objected to plaintiff's counsel's remarks. As to the first objection, counsel's analogy was in direct response to comments made by defendants' counsel and not intended to mislead or inflame the jury. *Aiello v. Ed Saxe Real Estate Inc.,* 327 Pa. Super. 429, 439-40, 476 A.2d 27, 33 (1984), *rev'd on other grounds,* 508 Pa. 553, 499 A.2d 282 (1985), (whether remarks made by trial counsel in closing arguments are objectionable requires a determination whether they are legitimately responsive to opposing counsel's closing arguments). As to defendants' second objection, we immediately issued a curative instruction advising the jury that counsel's argument on this point was not supported by the record and should not be given any consideration. (N.T., vol. V, pp. 88-89.) Given this curative instruction, there was no undue prejudice to defendants. See *Slappo v. J's Development Associates Inc.,* 791 A.2d 409, 414 (Pa. Super. 2002) (trial court's decision on whether or not to grant a new trial requires a two-part analysis: "(1) whether a mistake occurred at trial; and (2) whether the mistake was prejudicial to the moving party."). We find no merit to defendants' post-trial motion on either of these two bases.

## CONCLUSION

Having carefully reviewed and considered the issues which have been raised in the parties' respective post-trial motions and which have been briefed and argued, we are convinced that no legal error exists. We further believe the jury's verdict was fair and is amply supported by the evidence of record. Accordingly, both plaintiff's and defendants' post-trial motions will be denied.